183 Cal.App.4th 1470 (2010)
EDWARD WALTON et al., Plaintiffs and Respondents,
v.
THE WILLIAM POWELL COMPANY, Defendant and Appellant.
No. B208214.
Court of Appeals of California, Second District, Division Four.
April 22, 2010.
*1473 Horvitz & Levy, Lisa Perrochet, Jason R. Litt; Foley & Mansfield, Douglas G. Wah and Khaled Taqi-Eddin for Defendant and Appellant.
Simon, Eddins & Greenstone and Brian P. Barrow for Plaintiffs and Respondents.

OPINION
MANELLA, J.
Respondents Edward and Carol Walton asserted claims for negligence and strict liability against appellant The William Powell Company (Powell), alleging that asbestos-laden materials associated with valves made by Powell injured Edward Walton. After the jury returned a verdict in the Waltons' favor, a judgment was entered awarding them $5,660,624.39 in damages. We conclude that because Edward Walton's injuries stemmed entirely from exposure to asbestos-laden products for which Powell is not liable, we must reverse.

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. Pretrial Proceedings

Beginning in the late 1940's, Powell sold metal valves, together with asbestos gaskets and packing, to the United States Navy. Edward Walton served in the United States Navy from 1946 to 1968. During two periods of his service Walton repaired shipboard propulsion and heating systems, which used valves in conjunction with asbestos insulation and other asbestos-laden items. After leaving the Navy, Walton operated a painting business that brought him into contact with products containing asbestos. In November 2005, Walton was diagnosed as suffering from lung cancer.
*1474 On November 2, 2006, the Waltons filed their complaint for negligence and strict liability against Powell and approximately 45 other defendants.[1] The complaint alleged that Edward Walton's lung cancer and related medical conditions resulted from his exposure to asbestos in connection with the defendants' products. The Waltons sought compensatory and punitive damages.
Several defendants other than Powell sought summary judgment on the Waltons' claims, contending that the pumps, valves, and other items they had provided to the Navy did not, in fact, cause Edward Walton's injuries. These motions relied in part on the so-called component parts doctrine, which in some circumstances shields a component manufacturer from strict liability for a finished product that incorporates its component. (Taylor v. Elliott Turbomachinery Co. Inc. (2009) 171 Cal.App.4th 564, 576 [90 Cal.Rptr.3d 414] (Taylor).) In addition, Powell and other defendants joined in a motion in limine to exclude the Waltons' evidence on the basis of the doctrine. The trial court denied all but one of the motions for summary judgment and the in limine motion.[2]

B. Trial

On February 20, 2008, at the commencement of jury selection, six defendants remained in the action, including Powell. The next day, when the Waltons made their opening statement to the jury, Powell and a pump manufacturer were the only defendants in the action. By midtrial, Powell was the sole defendant in the action.
At trial, evidence was presented that Powell manufactured metal valves for a large number of military and nonmilitary applications. The valves were of many types, and employed a variety of gaskets, some of which contained no asbestos. Although some of the valves used asbestos gaskets and packing, Powell made only the valves. The Navy was among Powell's customers for these valves. From the late 1940's to 1991, Powell provided asbestos gaskets and packing from other manufacturers with its valves; in addition, Powell sold replacement asbestos gaskets and packing, but received relatively few orders because the "end users" preferred to order directly from gasket and packing manufacturers, who sold the same items at lower prices. No warnings about asbestos were placed on the valves. According to Powell, it first became aware of the hazards of asbestos in the mid-1980's, and began phasing out the use of asbestos in its products in 1987.
*1475 Edward Walton testified as follows: He enlisted in the Navy in 1946, and served as deckhand prior to 1953, when he began working as a welder and metalsmith. From 1953 to 1959, and from 1966 to 1968, Walton repaired shipboard heating and propulsion systems. During these periods, he served aboard destroyer tenders, vessels that provided maintenance services for destroyers. The shipboard systems on the destroyers that he serviced used asbestos insulation and other asbestos-laden items. Among his tasks was the maintenance of valves and pumps below deck in the engine and fire rooms, where the boilers and turbines were located. The valves and pumps were supplied by several manufacturers. He first encountered a Powell valve after June 1956.
In working on a valve, Walton removed asbestos insulation from the valve's exterior, removed the asbestos gaskets (if any) that sealed the valve to adjoining pipes, extracted asbestos packing from the valve's interior, and installed new asbestos packing and gaskets, as needed. The gaskets were often cut from sheets of asbestos, and the packing was fashioned from rolls of replacement packing. Walton also encountered asbestos insulation and gaskets when he worked on pumps. During these activities, the air that Walton breathed became dirty and dusty. He removed asbestos insulation from Powell valves "numerous times, many, many times," but saw no warnings about asbestos on the valves.
Walton attributed none of the asbestos products he contacted to Powell. He testified that he often serviced valves in destroyers built during or before World War II, and worked only on old valves "with many coats of paint." Walton believed that the valves' original gaskets and packing had been replaced before he worked on them.[3] According to Walton, most of the replacement packing and gaskets came from a source other than Powell, and he otherwise could not specify their sources. He knew neither the manufacturer of the valves' insulation nor the number of times that the insulation had been replaced.
Walton left the Navy in 1968 and operated a painting company until 1999. As a painter, he worked with asbestos-laden sheetrock, textured ceilings, and taping mud. In late 2005, he was diagnosed as suffering from lung cancer.
*1476 Dr. Edwin Crosby Holstein, a specialist in asbestos-related diseases, and Arnold R. Brody, a cell biologist and experimental pathologist, testified regarding Edward Walton's medical condition and its causes. Holstein opined that Walton's exposure to asbestos in connection with Powell valves was a significant contributing cause of Walton's lung cancer.[4] Brody testified that Walton's history of asbestos-related medical conditions were sufficient to establish that asbestos caused his lung cancer.[5]

C. Verdict and Judgment

The jury found that Edward Walton had suffered $561,861 in economic damages and $20 million in noneconomic damages, and allocated Powell a 25 percent share of the responsibility for the causation of these damages.[6] In addition, the jury found that Powell had acted with malice, oppression, or fraud, but awarded no punitive damages. On March 6, 2008, a judgment was entered in favor of the Waltons awarding damages totaling $5,660,624.39.[7] The trial court later denied Powell's motions for a new trial and judgment notwithstanding the verdict. This appeal followed.

DISCUSSION
Powell contends that the Waltons' claims for strict liability and negligence fail because its valves were not defective and caused no injury to Edward Walton.[8] We agree. As explained below, Powell supplied none of the asbestos products to which Edward Walton was exposed, and its valves had no defect rendering Powell liable for the injuries that Walton may have sustained through exposure to asbestos products from other sources.
(1) Generally, in a products liability case, a plaintiff may seek recovery on theories of strict liability and negligence. (Merrill v. Navegar, Inc. (2001) *1477 26 Cal.4th 465, 478-479 [110 Cal.Rptr.2d 370, 28 P.3d 116].) "[U]nder either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury. [Citations.] Under a negligence theory, a plaintiff must also prove `an additional element, namely, that the defect in the product was due to negligence of the defendant.' " (Id. at p. 479, quoting Prosser, Strict Liability to the Consumer (1966) 18 Hastings L.J. 9, 50-51.) Here, the Waltons sought recovery on theories of strict liability and negligence, asserting that Powell's valves lacked adequate warnings about the hazards of asbestos and were otherwise defective in their design.

A. Strict Liability

1. Governing Principles

(2) We begin with the Waltons' claims based on strict liability. California law "provides generally that manufacturers, retailers, and others in the marketing chain of a product are strictly liable in tort for personal injuries caused by a defective product." (Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1188 [43 Cal.Rptr.2d 836, 899 P.2d 905].) However, strict liability is not imposed on parties that are "not a part of the manufacturing or marketing enterprise of the allegedly defective product that caused the injury in question." (Ibid.) The burden falls upon the plaintiff to produce adequate evidence "linking the injury-producing product with a particular entity in the stream of commerce of that product." (Taylor, supra, 171 Cal.App.4th at p. 576.) Recovery is permitted in strict liability for three kinds of defects: manufacturing defects, design defects, and "`warning defects,' i.e., inadequate warnings or failures to warn." (Anderson v. Owens-Corning Fiberglas Corp. (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549].)
(3) Pertinent to our inquiry is the component parts doctrine, which in some circumstances exempts a manufacturer from liability arising from a finished product that incorporates a component supplied by the manufacturer. (Taylor, supra, 171 Cal.App.4th at p. 576.) Generally, a component manufacturer is subject to liability only when the component itself has a defect that results in injury, or the manufacturer plays a material role in integrating the component into the finished product, whose defects cause injury. (Rest.3d Torts, Products Liability, § 5.)[9]
*1478 Two policy considerations underlie the component parts doctrine. "First, requiring suppliers of component parts to ensure the safety of their materials as used in other entities' finished products `"would require suppliers to `retain an expert in the client's field of business to determine whether the client intends to develop a safe product.[' "] [Citation.] Suppliers of "products that have multiple industrial uses" should not be forced "to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use." [Citation.] A second, related rationale is that "finished product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications." [Citations.]' " (Taylor, supra, 171 Cal.App.4th at p. 584, quoting Springmeyer v. Ford Motor Co. (1998) 60 Cal.App.4th 1541, 1554 [71 Cal.Rptr.2d 190].)[10]

2. No Strict Liability

The Waltons' strict liability claim relies on allegations that Powell's valves suffered from "warning" and design defects. For the reasons explained below, the claim fails under each theory.

a. No Duty to Warn

(4) At trial, the Waltons asserted that Powell's valves were defective because they incorporated no warning regarding the hazards of asbestos packing, gaskets, and insulation. "Generally speaking, manufacturers have a duty to warn consumers about the hazards inherent in their products. [Citation.] The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use." (Johnson v. American Standard, Inc. (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905].) A product that is otherwise flawless in its design and manufacture "`may nevertheless possess such risks to the user without a *1479 suitable warning that it becomes "defective" simply by the absence of a warning.'" (Finn v. G. D. Searle & Co. (1984) 35 Cal.3d 691, 699 [200 Cal.Rptr. 870, 677 P.2d 1147].)
In Taylor, on facts materially similar to those before us, the appellate court held that a strict liability claim predicated on a warning defect failed as a matter of law. (Taylor, supra, 171 Cal.App.4th at p. 571.) There, the widow of a Navy seaman sued several valve and pump manufacturers, alleging that they were responsible for her husband's asbestos-related injuries. (Id. at pp. 570-571.) The defendants had supplied valves and pumps, along with asbestos gaskets and packing, to the Navy in the 1940's. (Ibid.) The plaintiff asserted negligence and strict liability claims based on the theory that the defendants had a duty to issue a warning regarding the hazards of asbestos. (Id. at pp. 571, 593.) In seeking summary judgment on the claims, the defendants established that they had manufactured only the valves and pumps they had supplied the Navy; that the husband enlisted in 1964; and that he had repaired valves and pumps whose original packing and gaskets had been replaced by items from other manufacturers. (Id. at pp. 571-572.)
(5) The appellate court affirmed the grant of summary judgment in the defendants' favor, concluding that the plaintiff's "duty to warn" strict liability claim failed for three reasons. (Taylor, supra, 171 Cal.App.4th at pp. 577-586.) First, as the court noted, the defendants were not part of the chain of distribution of the injury-causing products, as the husband had no contact with any asbestos-laden products that the defendants had provided. (Id. at pp. 577-579.) Second, following an examination of California law, the court determined that the defendants had no duty to issue warnings regarding the hazards of asbestos "released from products made or supplied by other manufacturers and used in conjunction with [the defendants'] equipment." (Id. at pp. 579-583.) Third, the court concluded that the component parts doctrine shielded the defendants from liability, as there was no evidence that their valves and pumps were themselves defective or that the defendants played a material role in the design of the shipboard systems. (Id. at p. 585.) Although the defendants had provided valves and pumps in accordance with the Navy's specifications, the court reasoned that this conduct was insufficient to support strict liability, pointing to the Restatement Third of Torts, which states: "A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable ...." (Rest.3d Torts, Products Liability, § 5, com. e, p. 135.)
We conclude that the Waltons' strict liability claim based on the duty to warn fails for the same reasons. To begin, the Waltons did not establish that Powell was part of the chain of distribution of the asbestos products that *1480 contributed to Edward Walton's injuries. Nothing before us supports the inference that Edward Walton had any contact with asbestos products supplied by Powell.[11]
There is no evidence that Powell ever provided the type of insulation covering the valves that Walton repaired. Nor does the record support a reasonable inference that Powell supplied either the packing and gaskets that Walton removed from the valves or their replacements. On these matters, Walton testified that he first worked on a Powell valve no earlier than June 1956; that many of the ships whose valves he serviced were built during or before World War II; that all the valves he encountered were old, as evidenced by their "many coats of paint"; and that the original packing and gaskets had probably been replacedperhaps many timesbefore he worked on the valves. He also stated that a manufacturer other than Powell provided most of the new packing, and that he did not know whether Powell had supplied any of the replacement gaskets or packing. There is no evidence that the Navy ever bought replacements from Powell; the only evidence suggested that the Navy did not, as Powell received relatively few orders for replacements due to its high prices.
(6) On this record, any inference that Walton was exposed to asbestos from products supplied by Powell is speculation. Because the Waltons failed to "link[] the injury-producing product with [Powell] in the stream of commerce of that product," Powell's original provision of asbestos packing and gaskets to the Navy did not render it strictly liable for Walton's injuries. (Taylor, supra, 171 Cal.App.4th at pp. 576-579; see Cadlo v. Owens-Illinois, Inc. (2004) 125 Cal.App.4th 513, 523-524 [23 Cal.Rptr.3d 1] [former supplier of asbestos insulation to Navy was not strictly liable for seaman's injuries from exposure to asbestos insulation, as there was no evidence that former supplier had role in the design and marketing of asbestos insulation to which seaman was actually exposed].)
(7) Nor was Powell subject to a duty to warn because its valves were used in combination with the asbestos-laden products to which Walton was *1481 exposed. As explained in Taylor, the employment of a nondefective component in an injury-causing shipboard propulsion or heating system is not, by itself, sufficient to trigger the duty to warn; the plaintiff must show that the component manufacturer "participated in the integration of the[] component[] into the design of the [system]." (Taylor, supra, 171 Cal.App.4th at p. 585.) The Waltons made no such showing. The record discloses only that the Navy, in ordering the valves from Powell, specified that the valves must have a certain type of flange (or fitting for gaskets); that Powell provided valves with the specified flange; and that Powell also supplied the Navy with technical documents and instruction manuals regarding the valves they provided. As these facts do not show that Powell participated in the design of the Navy's systems or the system components provided by other manufacturers, they do not establish a duty to warn. (Id. at pp. 584-586; see also Blackwell v. Phelps Dodge Corp. (1984) 157 Cal.App.3d 372, 377-378 [203 Cal.Rptr. 706] [acid manufacturer had no duty to warn about dangers of pressure formation from acid when manufacturer lacked control over shipping arrangements, and placed the acid as ordered in defective tank cars provided by other parties]; Garman v. Magic Chef, Inc. (1981) 117 Cal.App.3d 634, 637-638 [173 Cal.Rptr. 20] [propane stove manufacturer had no duty to warn regarding hazards associated with pipe connecting stove to propane tank when it did not supply or install pipe].)

b. No Design Defect

At trial, the Waltons also asserted that Powell's valves were defective because they were designed for use in concert with asbestos gaskets, packing, and insulation. They presented evidence that Powell's valves were designed to permit the replacement of the packing and gaskets, and that Powell knew that insulation placed by others on its valves would have to be removed when the valves were repaired. On appeal, the Waltons contend that the valves were defective in their design even if none of the asbestos products with which Walton had contact were provided by Powell. The crux of their contention is that Powell intentionally designed their valves to be used with asbestos products from other manufacturers. In our view, the theory that the valves suffered from a design defect fails under the component parts doctrine.
(8) Generally, the doctrine applies to items such as "raw materials, valves, [and] switches, [which] have no functional capabilities unless integrated into other products." (Rest.3d Torts, Products Liability, § 5, com. a, pp. 130-131.) As explained in the Restatement Third of Torts, Products Liability, the doctrine encompasses such itemsprovided that they are nondefective in themselvesbecause "[i]mposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to *1482 develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product." (Rest.3d Torts, Products Liability, § 5, com. a, p. 131.)
Powell's valves fall squarely within this rationale for the component parts doctrine. Powell made only metal valves, which had no functional value until integrated into broader systems with pipes and other elements, such as the Navy's propulsion and heating systems. Because integration would have been impossible if the valves were not compatible with other products used in such systems, Powell designed metal valves that could be combined with gaskets, packing, and insulation from other sources, as Powell itself made none of these items. Nothing before us suggests that Powell had a role in designing the available gaskets, packing, and insulation or the shipboard systems into which its valves were integrated. To impose liability on Powell for the hazards associated with asbestos would have obliged it to scrutinize the development of several productsthe gaskets, packing, and insulation made by others, and the Navy's shipboard systemsover which it had no control. This would have required Powell to acquire "sufficient sophistication to review the decisions of the ... entit[ies]" directly responsible for the products in question. (Rest.3d Torts, Products Liability, § 5, com. a, p. 131; see also Cadlo v. Owens-Illinois, Inc., supra, 125 Cal.App.4th at pp. 523-524 [former asbestos insulation manufacturer is not liable for injuries arising from exposure to asbestos insulation it neither designed nor marketed].)

c. The Waltons' Contentions

Pointing primarily to Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co. (2004) 129 Cal.App.4th 577, 579-581 [28 Cal.Rptr.3d 744] (Tellez-Cordova), the Waltons contend that Powell is strictly liable for Edward Walton's injuries, even if Powell did not supply the asbestos-laden products that he encountered while working on Powell's valves. In Tellez-Cordova, the plaintiff asserted strict liability claims based on "warning" and design defects against manufacturers of grinding tools that the plaintiff had used. The plaintiff's complaint alleged that he had suffered injury as the result of exposure to toxic dust released from abrasive discs powered by the tools. (Ibid.) The defendants successfully demurred to the complaint on the basis of the component parts doctrine. (Id. at p. 581.) In reversing, the appellate court noted that the complaint alleged that the tools were specifically designed to be used with the abrasive discs for the purpose of grinding metals, and that toxic dust was created when the tools were used for their intended purpose. (Id. at pp. 582-583.) In view of the allegations, the court concluded that the component parts doctrine was inapplicable, as the defendants' grinding tools had only one intended purposethat is, to power abrasive wheelsand there was no "`finished product manufacturer'" in a superior position to issue warnings about the "completed product." (Ibid.)
*1483 (9) In our view, Tellez-Cordova stands for the proposition that the component parts doctrine is inapplicable when a manufacturer's product is uniquely designed to complete a system that is hazardous in its intended use. That is not the case here. Unlike Tellez-Cordova, in which the tools and discs formed a single system over which the tool manufacturers had significant control, the combination of Powell's valves with the packing, gaskets, and insulation formed no such system. Even when joined with the packing, gaskets, and insulation, the valves had no functional value until integrated into broader systemsfor example, the Navy's shipboard systems containing other components; moreover, there is no evidence Powell played a role in developing the shipboard systems in which its valves were placed.
The remaining case authority upon which the Waltons rely is also distinguishable. In Wright v. Stang Manufacturing Co. (1997) 54 Cal.App.4th 1218, 1222 [63 Cal.Rptr.2d 422] (Wright), the defendant manufactured a water cannon that had been mounted on a fire engine. When the plaintiff, a firefighter, used the water cannon, it broke loose, threw him to the ground, and fell on him. (Ibid.) The defendant obtained summary judgment on the plaintiff's strict liability claim on the theory that the cannon's mount, rather than the cannon itself, was defective. (Id. at pp. 1222-1223.) In reversing the summary judgment, the appellate court concluded that there were triable issues whether the cannon suffered from a design defect because it was incompatible with a sufficiently strong mounting system; in addition, the court determined that there were triable issues whether the defendant had failed to warn about a potential mismatch between the cannon's water pressure and the strength of its mount. (Id. at p. 1236.)
In Wright, unlike here, the defendant's product itself injured the plaintiff. Moreover, the design and warning defects were directly tied to features of the productprincipally, the cannon's water pressure and incompatibility with safe mountingthat its manufacturer was in the best position to identify as problematic. As explained above, Powell had no control over the development of the asbestos-laden products used in conjunction with its valves.
In DeLeon v. Commercial Manufacturing & Supply Co. (1983) 148 Cal.App.3d 336, 340 [195 Cal.Rptr. 867], the plaintiff, a worker in a fruit processing plant, was injured when her arm was caught in a rotating power shaft located three feet above a fruit bin she had been cleaning. She sued the bin's manufacturer, which obtained summary judgment on her strict liability claims. (Id. at pp. 340-342.) The appellate court reversed, concluding there were triable issues regarding the application of the component parts doctrine, as there was evidence the manufacturer had participated in the design of the production line that incorporated the bin. (Id. at p. 345.) In contrast, here there was no evidence Powell contributed to the design of the asbestos products or the Navy's systems.
*1484 Finally, in Gonzales v. Carmenita Ford Truck Sales, Inc. (1987) 192 Cal.App.3d 1143, 1145-1146 [238 Cal.Rptr. 18], the plaintiff was injured when the brakes of his truck failed. The plaintiff asserted claims for negligence and products liability against the defendant, which had sold and serviced the truck. (Id. at p. 1146.) At trial, the court declined to instruct the jury on the plaintiff's theory that the defendant had failed to give adequate warnings about the necessity for regular adjustments to the truck's airbrakes. (Id. at pp. 1147-1152.) In determining that the denial was error, the appellate court stated that warnings are in order when necessary to prevent a product from becoming unreasonably dangerous. (Id. at p. 1151.) Here, unlike Gonzales, Powell did not provide the products that injured Walton. As explained above (see pt. A.2.a., ante), Powell had no duty to provide a warning about products from other sources.
(10) The Waltons also suggest that Powell was strictly liable for Edward Walton's injuries because it was foreseeable to Powell that Walton would be exposed to asbestos while working on Powell's valves, even if none of the asbestos he encountered came from products supplied by Powell. We disagree. As explained in Taylor, foreseeability alone does not warrant imposition of strict liability when, as here, the upshot of the imposition would be to require the component manufacturer to retain "`"an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems."'" (Taylor, supra, 171 Cal.App.4th at pp. 585-586, quoting Artiglio v. General Electric Co. (1998) 61 Cal.App.4th 830, 839 [71 Cal.Rptr.2d 817].) In sum, the Waltons' strict liability claims fail as a matter of law.

B. Negligence

At trial, the Waltons asserted that Powell was liable for Edward Walton's injuries on a theory of negligence. We conclude that this theory also fails under Taylor. There, applying the multifactored test stated in Rowland v. Christian (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], the appellate court held that the defendants had no pertinent duty of care toward the plaintiff's husband.[12] (Taylor, supra, 171 Cal.App.4th at pp. 593-596.) In so *1485 concluding, the court placed special emphasis on the defendants' lack of responsibility for injury under the theory of strict liability, as well as the fact that the husband was exposed to asbestos from third party products more than 20 years after the defendants provided their valves and pumps to the Navy. (Id. at pp. 594-596.) Here, as in Taylor, Powell is not strictly liable for Walton's injuries, which arose from exposure to asbestos products from other sources long after Powell supplied the valves that Walton encountered. In view of Taylor, Powell had no duty of care toward him for purposes of a negligence claim. The Waltons therefore cannot state a claim for negligence.

DISPOSITION
The judgment is reversed, and the matter is remanded with directions to the trial court to vacate the judgment and enter a new judgment in favor of Powell on the Waltons' claims. Powell is awarded its costs on appeal.
Epstein, P. J., and Willhite, J., concurred.
NOTES
[1] The complaint also asserted a claim for conspiracy and a claim by Carol Walton for loss of consortium.
[2] The trial court granted summary judgment in favor of Cla-Val Co., concluding that it supplied no asbestos-laden items to the Navy, and that its valves were not designed for use in connection with such items.
[3] Regarding the valves' packing and gaskets, Walton testified as follows:

"Q. So as far as you know, the packing on those valves would have been replaced many times?
"A. It might have been.
"Q. And same with the gaskets, as far as you know [the gaskets] would have been replaced many times?
"A. I would say it most likely had to have been."
[4] Holstein also testified that asbestosis was identified as an asbestos-related disease no later than the 1930's, and that at least 700 articles concerning the hazards of asbestos had been published by 1964.
[5] The jury also heard excerpts from the deposition of Dr. Shigeru Chino, a cardiothoracic surgeon, who began treating Edward Walton in December 2005, and soon determined that he suffered from lung cancer.
[6] The jury also awarded damages of $500,000 to Carol Walton for her loss of consortium.
[7] The damage award reflects adjustments for settlements by defendants other than Powell.
[8] Powell also contends (1) that there is insufficient evidence that Edward Walton's exposure to asbestos in connection with its valves caused his lung cancer; (2) that the jury's allocation of fault to Powell fails for want of substantial evidence; (3) that the trial court erred in admitting an internal Powell memorandum dated December 4, 1987; (4) that the trial court improperly denied Powell's request for a continuance during the trial; and (5) that the award for noneconomic damage is excessive. As we conclude that the Waltons' claims fail as a matter of law under the component parts doctrine, we do not address these contentions.
[9] Section 5 of the Restatement Third of Torts, Products Liability states in pertinent part: "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if: (a) the component is defective in itself ... and the defect causes the harm; or [¶] (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and [¶] [(b)](2) the integration of the component causes the product to be defective ... and [¶] [(b)](3) the defect in the product causes the harm."
[10] The Restatement Third of Torts explains the rationale underlying the doctrine in the following terms: "As a general rule, component sellers should not be liable when the component itself is not defective .... If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective. Imposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product." (Rest.3d Torts, Products Liability, § 5, com. a, p. 131.)
[11] On appeal, we examine the record for substantial evidence concerning the requisite link between Powell's distribution activities and Edward Walton's asbestos-related injuries. In this regard, our inquiry "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact] ...." (Bowers v. Bernards (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], italics omitted.) However, "substantial evidence" is not "`synonymous with "any" evidence. It must be reasonable ..., credible, and of solid value ....' [Citation.]" (Kuhn v. Department of General Services (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) Finally, "in all cases, the determination whether there was substantial evidence to support a finding or judgment must be based on the whole record." (Rivard v. Board of Pension Commissioners (1985) 164 Cal.App.3d 405, 412 [210 Cal.Rptr. 509].)
[12] Under the Rowland test, the existence of a duty of care is determined by reference to numerous policy factors, including "`the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]' " (Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 473 [63 Cal.Rptr.2d 291, 936 P.2d 70], quoting Rowland v. Christian, supra, 69 Cal.2d at p. 113.)