[No. A130213. First Dist., Div. One. Apr. 13, 2012.]

LEONARD SHIELDS et al., Plaintiffs and Appellants, v. HENNESSY INDUSTRIES, INC., Defendant and Respondent. [And four other cases.*]

*Godbee v. Hennessy Industries, Inc. (No. A130532 [Super. Ct. S.F. City and County, No. CGC-09-275142]); Hetzel v. Hennessy Industries, Inc. (No. A130533 [Super. Ct. S.F. City and County, No. CGC-08-274902]); Kennedy v. Hennessy Industries, Inc. (No. A131064 [Super. Ct. S.F. City and County, No. CGC-09-275392]); Schlimmer v. Hennessy Industries, Inc. (No. A131072 [Super. Ct. S.F. City and County, No. CGC-09-275231]).

**COUNSEL**

Brayton Purcell and Richard M. Grant for Plaintiffs and Appellants.

Gordon & Rees, Matthew G. Kleiner and Kevin Whelan for Defendant and Respondent.

**OPINION**

**MARCHIANO, P. J.**—Plaintiffs in these consolidated actions appeal from judgments on the pleadings in favor of defendant Hennessy Industries, Inc. (Hennessy), the manufacturer of a brake arcing machine. Each of the plaintiffs alleged Hennessy's machine was designed and used exclusively for the purpose of shaping, by grinding action, brake linings that were manufactured by others, but contained asbestos fibers that were dangerously released into the air by the normal action of Hennessy's machine. The trial court ruled that, because Hennessey's machine itself was not made with asbestos and Hennessy did not itself manufacture or distribute any product made with

asbestos, plaintiffs had not, and could not, plead a viable cause of action against Hennessy for negligence or strict products liability.

As discussed below, we conclude, in light of the Supreme Court's recent decision in *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 [135 Cal.Rptr.3d 288, 266 P.3d 987] (*O'Neil*), as well as earlier Court of Appeal decisions including *Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564 [90 Cal.Rptr.3d 414] (*Taylor*), and *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 [28 Cal.Rptr.3d 744] (*Tellez-Cordova*), plaintiffs have pleaded viable causes of action for negligence and strict liability for purposes of overcoming a motion for judgment on the pleadings. Accordingly, we reverse and remand these actions for further proceedings.

## BACKGROUND

Leonard Shields alleged he worked predominantly as a mechanic and suffered exposure to asbestos resulting in injuries, including asbestos-related pleural disease diagnosed in 1994, asbestosis diagnosed in 1996, and lung cancer diagnosed in 2008. The other plaintiffs pleaded similar work experience as mechanics, ironworkers, or pipefitters, with similar exposure to asbestos and similar injuries.[1]

Each of the plaintiffs' complaints, filed between July 2008 and May 2010, named numerous defendants including Hennessy. All plaintiffs are represented by the same law firm, which in 2003 had filed a "Master Complaint" pursuant to general order No. 55—issued by the trial court in 1996—which allowed the use of master pleadings in asbestos litigation. Each complaint thus incorporated most, if not all, of its causes of action from the firm's Master Complaint, designating the defendants to which each incorporated cause of action applied. The five complaints pleaded four or five causes of action against Hennessy in this manner.

Of these incorporated causes of action, two in each complaint are referred to as the Master Complaint's "Brake Shoe Grinding Machine" causes of action—one based on negligence and the other on strict products liability. These two commonly pleaded causes of action are the focus of all five appeals.

In June and July 2010, Hennessy filed motions for judgment on the pleadings against each of plaintiffs' complaints. Between late July and late

---

[1] In one of the consolidated appeals, plaintiffs are the heirs and successors of decedent Ted Kennedy, who allegedly worked as an automobile mechanic, suffered exposure to asbestos, and died about a year and a half after being diagnosed with asbestosis and asbestos-related pleural disease in April 2008.

November of that year, the trial court held hearings on these motions, granted judgment on the pleadings and denied leave to amend. In each case, the court subsequently entered judgment in favor of Hennessy.

Each of the plaintiffs appealed.[2] (See Code Civ. Proc., § 904.1, subd. (a)(1).)

## DISCUSSION

### I. Standard of Review

Each of the plaintiffs contends the trial court erred in granting Hennessy's motion for judgment on the pleadings and in denying leave to amend.

The standard for granting a motion for judgment on the pleadings is essentially the same as that applicable to a general demurrer. The trial court determines whether it appears from the pleadings, together with matters that may be judicially noticed, the moving party is entitled to judgment as a matter of law. We review the trial court's determination de novo. In doing so, we assume the truth of, and liberally construe all properly pleaded factual allegations in the complaint. (*Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 321 [107 Cal.Rptr.3d 384] (*Bezirdjian*).) In determining whether the pleadings entitle the moving party to judgment as a matter of law, we conduct the appropriate analysis without deferring to the reasoning of the trial court. (*Id.* at p. 322.)

We review the trial court's denial of leave to amend for abuse of discretion, which the plaintiffs must establish by offering proposed amendments to this court that state a legally sufficient cause of action. (*Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 7–8 [86 Cal.Rptr.2d 73].)

### II. The Pleadings

In reviewing the two "Brake Shoe Grinding Machine" causes of action at issue, we focus on the proposed amended version submitted to the trial court by each of the plaintiffs in early September 2010.

Hennessy has objected, with respect to three of the five consolidated appeals, that plaintiffs may not rely on the proposed amended version,

---

[2] We note there are 21 separate appeals pending before this court, all involving plaintiffs who pleaded similar causes of action based on the law firm's Master Complaint, and who appealed following the trial court's grant of a motion for judgment on the pleadings. On October 17, 2011, we ordered consolidation of the five appeals assigned to Division One under the court's internal operating procedures.

because plaintiffs did not present the proposed amendments to the trial court *before* it made its ruling granting the motion for judgment on the pleadings without leave to amend.[3] It is evident, however, in these cases plaintiffs adequately presented to the court the gist of these proposed amendments in arguing against the motion for judgment on the pleadings.[4] In any event, when a judgment on the pleadings is sustained without leave to amend, an appellant may argue for the first time on appeal the complaint may be amended to state a valid cause of action—based on the general rule that a litigant may raise for the first time on appeal a pure question of law based on undisputed facts. (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259–260 [108 Cal.Rptr.2d 739].) In other words, the appellant may assert the trial court abused its discretion in granting the motion without leave to amend, and it is not a prerequisite to this assertion the appellant first presented to the trial court a specific request to amend or an indication of its legal basis. (*Galligan v. City of San Bruno* (1982) 132 Cal.App.3d 869, 876 [183 Cal.Rptr. 466].)

The proposed amended version of the first "Brake Shoe Grinding Machine" cause of action—grounded on negligence—alleged Hennessy was engaged in the design, manufacture, and distribution of "asbestos brake shoe grinding machines."

Hennessy "negligently . . . manufactured [and] designed . . . certain asbestos brake shoe grinding machines . . . in that [these machines], while being used in a manner that was reasonable, failed to protect users . . . and others, including the plaintiff . . . from exposure to and inhalation and ingestion of asbestos fibers caused to be released from asbestos-containing brake lining[s] by the intended use of the asbestos brake shoe grinding machines . . . ."

Hennessy "knew or should have known, and intended, that the . . . brake shoe grinding machines . . . would be used by consumers, workers, bystanders, and others, including [plaintiff] in conjunction with asbestos-containing brake linings." "During all relevant time periods, all brake shoe linings used with or on automobiles, light trucks and commercial trucks, as serviced by [Hennessy's] products in the United States contained asbestos." "Until subjected to [Hennessy's] products, asbestos fiber bundles were physically bound

---

[3] In the remaining two cases, the trial court held its hearing on the motion for judgment on the pleadings after plaintiffs submitted supplemental opposition including the proposed amended version.

[4] For example, in their opposition to the motion, each of these plaintiffs urged that the evidence would prove that Hennessy designed, manufactured, and marketed its brakeshoe grinding machines "solely" for the purpose of abrading asbestos-containing brake linings, and these machines, when used for that purpose, caused the release of airborne asbestos that would otherwise have remained harmlessly contained within the linings.

or otherwise attached in a matrix in the non-friable asbestos brake lining[s]." Hennessy's "asbestos brake shoe grinding machine[s] . . . ground and abraded th[e] hard lining[s], as they were designed to do, and subjected [them] to pressures, temperatures and force inadequate to convert asbestos into inert forsterite, making portions of [the linings] into a fine powder and releasing the formerly bound-up asbestos into the air as airborne fibers that presented a significant danger to human health, as they would be breathed in by anyone in the area around the . . . machine during or after its use." The "only intended use" of these machines was "for grinding brake shoe linings, in order to match the size and shape between the shoe and [brake] drum . . . ."

Hennessy "knew, or should have known, that [its] brake shoe grinding machines would be used on asbestos-containing brake linings and, when used in the manner intended, would cause the release of asbestos fibers into the air around the users and bystanders, and others, including the plaintiff . . . and create a hazard from [the machines'] intended and only use." Hennessy "specifically designed [its] machines for grinding asbestos-containing brake linings [and they] had no other function than to grind asbestos-containing brake linings." This was "[t]hus [the] only 'inevitable use' of the machines, within the meaning of *Tellez-Cordova v. Campbell-Hausfied*[, *supra*,] 129 Cal.App.4th 577." The machines, "while being used in a manner that was reasonably foreseeable, failed to protect plaintiff from exposure to asbestos fibers [that the machine] themselves caused to be released from asbestos-containing brake lining, resulting in severe and permanent injury to plaintiff." The machines "could have been designed and built with features that would have prevented humans from exposure to asbestos made airborne by the machines." The machines' design defects included "failure to have effective dust collection systems" to prevent asbestos fiber release into the air, and "failure to ensure that the abrading mechanism" came into contact with the asbestos-containing brake lining with "sufficient revolution velocity . . . temperature and pressure . . . to immediately convert the asbestos fibers . . . into inert forsterite," a nondangerous substance. "The actions of [the] asbestos brake shoe grinding machines themselves created the asbestos exposure and risk of harm."

Hennessy's "asbestos brake shoe grinding machines . . . were defective and unsafe for their intended purpose in that [they] caused, and failed to prevent, the inhalation and ingestion of asbestos fibers by plaintiff [and the] use of [the] machines created the asbestos harm that injured plaintiff." "The defect" in these machines "existed . . . at the time they left [Hennessy's possession, the use]" of these machines "did, in fact, lead to inhalation and ingestion of asbestos fibers[, and the] defect . . . did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to 'exposed persons,' including [plaintiff]."

The proposed amended version of the second "Brake Shoe Grinding Machine" cause of action—based on strict products liability—incorporated the foregoing allegations, and stated further that Hennessy's "asbestos brake shoe grinding machines . . . were defective and unsafe for their intended purpose in that [they] caused, and thereafter also failed to prevent, the indiscriminate cleaving off, release, circulation, wholesale contamination of product, appurtenances, workspace, breathing zone and worksite, and thereby the inhalation and ingestion of asbestos fibers by workers, bystanders . . . and others, including plaintiff." "The defect existed in [these machines] at the time they left [Hennessy's] possession[, use of these machines] did, in fact, lead to inhalation and ingestion of asbestos fibers[, and the] defect in [these machines] did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to 'exposed persons,' including [plaintiff]."[5]

## III.  The Relevant Law

### A.  Introduction

Plaintiffs argue that the proposed amended pleadings summarized above state viable causes of action for negligence and strict liability under *Taylor, supra,* 171 Cal.App.4th 564, and more particularly under *Tellez-Cordova, supra,* 129 Cal.App.4th 577. In supplemental briefing, plaintiffs further urge that the Supreme Court's recent decision in *O'Neil, supra,* 53 Cal.4th 335, also supports this argument.

### B.  Tellez-Cordova

In *Tellez-Cordova,* the court conducted an analysis of a ruling sustaining a general demurrer involving a similar issue. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 579.) The primary plaintiff[6] in that case worked as a lamp maker, using various power tools manufactured by the defendants to saw, grind, and sand metal parts. He developed interstitial pulmonary fibrosis as a result of exposure to airborne toxic substances produced and released from both the metal parts and from discs, belts, and wheels that were attached to and used with the defendants' saws, grinders, and sanders. Among other things, the plaintiffs' complaint attempted to state—as in the cases before us—causes of action for negligence and strict liability based on design defect (as well as failure to warn). (129 Cal.App.4th at p. 579.) The complaint

---

[5] The two "Brake Shoe Grinding Machine" causes of action pleaded in the complaint brought by the heirs and successors of decedent Ted Kennedy were identical, except they alleged injury to the decedent, leading to his death, rather than to plaintiffs heirs and successors.

[6] A second plaintiff sought damages for loss of consortium. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 579.)

alleged that the defendants' power tools were designed specifically for use with wheels or discs " 'for the intended purpose of grinding and sanding metals,' " that the tools " 'necessarily operated' " with wheels or discs made of aluminum oxide and other inorganic material, and that when the tools were used for their intended purpose they generated a breathable metallic dust composed of both the metal being abraded and the material that comprised the abrasive wheels and discs attached to defendants' tools. It also alleged defendants were aware of this danger while the primary plaintiff was not. As liberally construed by the reviewing court, the complaint additionally alleged that the abrasive wheels and discs did not "create respirable metallic dust unless they were used with [defendants'] power tools, because it [was] the speed and force of those tools [that caused] the dust to become airborne." The alleged design defect in the tools was their lack of any exhaust ventilation system necessary to prevent or minimize the release of metallic or inorganic dusts during the intended use of the tools. (*Id.* at p. 580.) The defendants demurred on the ground that the harmful airborne metallic dust was caused by the wheel, disc, or belt attachments, and not by their power tools. (*Id.* at p. 581.)

The Court of Appeal reversed the judgment in favor of the defendants, holding the plaintiffs' complaint alleged sufficient causes of action for negligence and strict liability. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 588.) In relevant part, the court rejected the defendants' argument that they were not liable under the "component parts doctrine"—that is, the doctrine that the manufacturer of a nondefective component part is not liable for defects in the final product over which it had no control. The court reasoned the complaint did not allege that the defendants' tools were component parts that could be used in a variety of finished products, but rather were specifically designed to be used with the abrasive wheels or discs that the plaintiff used with the tools, for the sole intended purpose of *grinding and sanding* metals. The tools were thus "necessarily operated" with those wheels or discs, the wheels and discs were harmless without the power supplied by the tools, and only when the tools were used as intended was harmful metallic dust released into the air. (*Id.* at pp. 581–582.) The court further noted the principal policy reasons underlying the component parts doctrine were not applicable. As the complaint alleged the defendants' tools had only one intended use, the defendants were not required to anticipate and incorporate safety measures that might be unnecessary for some uses of their tools. Nor was there, under the allegations, any other finished product that incorporated or adapted the tools, such that there was a finished product manufacturer that stood in a better position than the defendants to understand and protect against any risk of harm posed by the tools' special adaptation into

another, completed product.[7] Rather, it was alleged the defendants' tools were directly used for their intended purpose by consumers such as the primary plaintiff. (129 Cal.App.4th at pp. 582–583.) The court rejected the proposition the defendants could not foresee what attachment might be used with their tools, nor what surface to which the attachment might be applied, given the allegation that the "inevitable use" of the tools was with the specified wheels and discs to grind or sand metals. (*Id.* at p. 584.)

### C. *Taylor*

In the *Taylor* decision, involving a component part issue, the primary plaintiff suffered exposure to asbestos-containing products while serving aboard a United States Navy aircraft carrier. The defendants had furnished the various pieces of equipment to the United States Navy that were placed in the carrier when it was first commissioned during World War II, some of which included parts—such as gaskets, packing, and insulation—containing asbestos. The asbestos-containing parts to which that plaintiff had been exposed during his service in the 1960's, however, had been supplied not by the defendants, but by other manufacturers. The plaintiffs, the former naval serviceman and his wife, sought damages based, among other causes of action, on theories of negligence and strict liability due to the defendants' failure to warn of the dangers inherent in asbestos-containing materials. (*Taylor, supra*, 171 Cal.App.4th at pp. 570–571, 572, 574.) The trial court granted summary judgment as to most of the defendants on the ground that a manufacturer's duty to warn extended only to the manufacturer's own products. Division Five of this court affirmed, holding that California law imposed no duty on these defendants to warn of the hazards inherent in defective products manufactured or supplied by third parties. (*Id.* at p. 571.)

The primary plaintiff died during the pendency of the action, but his surviving wife contended on appeal that the defendants were negligently or strictly liable for failing to warn of the dangers inherent in the asbestos-containing gaskets, packing, and other parts that were used "in conjunction" or "in combination" with the defendants' equipment. (*Taylor, supra*, 171 Cal.App.4th at p. 574.) Thus, the court's focus in reviewing strict liability was limited to failure to warn, and did not encompass defects in the defendants' own manufacturing or design. (*Id.* at p. 577.)

The Court of Appeal concluded the defendants were not strictly liable for failure to warn under the "component parts" doctrine, among other reasons.

---

[7] Suppliers of component parts that have multiple industrial uses should not be forced to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use. Moreover, it is the finished product manufacturer that is generally in a better position to guarantee that the component is suitable for its particular application. (See Rest.3d Torts, Products Liability, § 5, com. a, p. 131.)

The court described the doctrine as one under which "the manufacturer of a product component is not liable for injuries caused by the finished product into which the component is incorporated[,] unless the component itself was defective at the time it left the manufacturer." (*Taylor, supra*, 171 Cal.App.4th at p. 584, citations omitted; see Rest.3d Torts, Products Liability, *supra*, § 5, com. a, p. 130.) Viewing the defendants as component parts manufacturers, whose products had been integrated by the United States Navy into the carrier's propulsion system without the defendants' participation, the court reasoned it was not the defendants' equipment that had released the asbestos fibers to which the deceased plaintiff had been exposed, but rather the gaskets, packing, and other asbestos-containing components manufactured by others and installed long after the defendants supplied their equipment. (*Taylor, supra*, at p. 585.)

The Court of Appeal distinguished the earlier decision in *Tellez-Cordova* because it involved a situation where the manufacturer's product itself caused or created the risk of harm when it was used in a reasonably foreseeable manner in combination with another manufacturer's product. (*Taylor, supra*, 171 Cal.App.4th at pp. 586–588.) That decision did not, in other words, impose "a duty to warn *solely* of the hazards of other manufacturers' products." (*Id.* at p. 588.) By contrast, the injuries at issue in *Taylor* were caused by the release of asbestos fibers from other parts manufactured by others, not by any action of the defendants' equipment. (*Id.* at p. 587.) The operative principle framed by the court was that "a manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, [but] that duty arises *only* when the manufacturer's own product causes or creates the risk of harm." (*Id.* at p. 580, original italics.)

### D. *O'Neil*

The facts presented to the Supreme Court in *O'Neil* were similar to those at issue in *Taylor*, involving component parts. The defendants in *O'Neil*, like those in *Taylor*, manufactured valves and pumps by specification for incorporation into the propulsion systems of United States Navy warships as they were first built during World War II. The plaintiffs brought a wrongful death action against them, based on their decedent's exposure to asbestos fibers while serving aboard one of those ships. Other manufacturers had made the asbestos gaskets, packing, and insulation that were incorporated into, or used with, the valves and pumps made by the defendants, but the plaintiffs claimed they were, nevertheless, strictly liable and negligent because it was reasonably foreseeable workers would be exposed to asbestos contained in replacement parts used in conjunction with the defendants' equipment. (*O'Neil, supra*, 53 Cal.4th at pp. 342–343, 345.)

The plaintiffs' evidence showed the decedent had served on a United States Navy aircraft carrier between 1965 and 1967, supervising enlisted men who serviced equipment in the carrier's steam propulsion system rooms. The decedent was exposed to the asbestos fibers released into the air by the action of those repairing or replacing asbestos-containing materials, which included not only gaskets and packing used within the defendants' valves and pumps, but also vast amounts of insulation that externally covered the propulsion system's miles of pipes, as well as its mechanisms. Some 40 years after his service on the aircraft carrier, the decedent was diagnosed with mesothelioma, a fatal cancer caused by asbestos exposure, and died the following year.[8] (*O'Neil, supra,* 53 Cal.4th at pp. 343, 345–346.)

The defendants in *O'Neil* made and supplied valves and pumps to the United States Navy, for incorporation into the aircraft carrier's initial propulsion system, more than 20 years before the decedent served on that craft. (*O'Neil, supra,* 53 Cal.4th at pp. 343–345.) They built this equipment to comply with design specifications provided by the United States Navy's Bureau of Ships, which required the inclusion of asbestos-containing gaskets and packing. (*Id.* at pp. 343–344.) Although the United States Navy's specifications required the initial inclusion of asbestos-containing gaskets and packing in the valves and pumps, neither defendant made these materials, but purchased them from United States Navy-approved vendors. There was also no evidence that the valves and pumps required the use of gaskets or packing made from asbestos in order to function properly, as distinguished from their use to comply with naval specifications. (*Id.* at p. 344.)

At the close of evidence, the defendants moved for nonsuit on all of the plaintiffs' causes of action, on the ground there was no evidence the decedent had been exposed to asbestos from any product they had manufactured, nor evidence that any product defect or failure to warn on their part was a substantial factor in causing the decedent's fatal cancer. The trial court granted their motions and dismissed all claims against the defendants. The court concluded, among other things, that the "component parts" doctrine shielded the defendants from liability because the United States Navy had integrated the defendants' nondefective valves and pumps into a larger "sophisticated system" without the defendants' participation. (*O'Neil, supra,* 53 Cal.4th at p. 346.)

In reversing the contrary decision of the Court of Appeal, the Supreme Court affirmed the trial court's judgment. (*O'Neil, supra,* 53 Cal.4th at

---

[8] It appears the United States Navy was aware as early as 1922 that airborne asbestos could potentially cause lung diseases, yet it did not, before the decedent's exposure to such airborne fibers, undertake to warn its seamen of this danger, nor advise them to take appropriate precautions. (*O'Neil, supra,* 53 Cal.4th at p. 345.)

p. 366.) Examining the evidence relating to the plaintiffs' claim of strict liability, the court reached two conclusions: (1) the defendants were not strictly liable for the decedent's injuries because "any design defect in *defendants' products* was not a legal cause of injury" to the decedent, and (2) the defendants were not strictly liable for failure "to warn of risks arising from *other manufacturers'* products." (*Id.* at p. 348, original italics.)

In explaining the first conclusion—that the defendants were not strictly liable because a defect in their own equipment was not a legal cause of the decedent's injury—the Supreme Court noted that strict products liability under California law, beginning with its decision in *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897], had always been limited to "harm caused by deficiencies in the defendant's own product." (*O'Neil, supra,* 53 Cal.4th at p. 348.) Whereas a defendant manufacturer may be strictly liable for its own defective, finished product, even when the defect is traceable to a defective component party supplied by another manufacturer, strict liability has never been held to encompass the "harm from entirely distinct products that the consumer can be expected to use with, or in, [a] defendant's nondefective product." (*Ibid.*)

In accordance with this principle, the court had articulated the "chain of distribution" doctrine in *Peterson v. Superior Court* (1995) 10 Cal.4th 1185 [43 Cal.Rptr.2d 836, 899 P.2d 905] (*Peterson*), limiting strict liability to "those entities responsible for placing a defective product into the stream of commerce." Other entities "outside the marketing enterprise," who generally had no continuing relationship with the manufacturer of the defective product, were in no position either to exert pressure on that manufacturer to make its product safe, or to share with that manufacturer the costs of insuring the safety of the defective product's users. (*O'Neil, supra,* 53 Cal.4th at p. 349.)

In *O'Neil,* the evidence indicated the decedent suffered exposure to asbestos in the 1960's from the external insulation and from replacement gaskets and packing that were in place at that time. It did not show, however, either that the defendants manufactured, sold, or advised the use of the external insulation, or that they had manufactured or sold the gaskets or packing the United States Navy had used in the 1960's to replace the original component parts the defendants had purchased from others and installed in their valves and pumps. (*O'Neil, supra,* 53 Cal.4th at pp. 345, 349.) The court concluded that, although the internal gaskets and packing originally supplied with the defendants' products contained asbestos, none of these original parts remained on the carrier when the decedent arrived decades later. Thus, "even

assuming the inclusion of asbestos makes a product defective," it was not any defect in the defendants' equipment, as supplied, that had been the legal cause of the decedent's injuries. (*Id.* at pp. 349–350.)

The court in *O'Neil* rejected the plaintiffs' claim that the defendants' products were defective because they had been " 'designed to be used' " with asbestos-containing components, concluding it was not supported by the record. The evidence showed, rather, that the defendants' valves and pumps were "designed to meet the [United States] Navy's specifications," and there was no evidence—"[a]part from the [United States] Navy's specifications"— that the defendants' products "*required* asbestos-containing gaskets or packing in order to function." (*O'Neil, supra,* 53 Cal.4th at p. 350, original italics.) The "mere compatibility" of the defendants' valves and pumps with asbestos-containing components was "not enough to render them defective."[9] (53 Cal.4th at p. 350.)

Turning to its conclusion that the defendants were not strictly liable for failure to warn of risks arising from other manufacturers' products—the court began with the general rule formulated in its decision in *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1003 [281 Cal.Rptr. 528, 810 P.2d 549]—that is, manufacturers have a strict liability duty to warn consumers about the hazards inherent in their own products. (*O'Neil, supra,* 53 Cal.4th at p. 351.) The court noted, however, it has never held that a manufacturer's strict liability duty to warn "extends to hazards arising exclusively from *other* manufacturers' products." (*Ibid.*, original italics.)

The court considered three Court of Appeal decisions, as well as several decisions from other jurisdictions, and found them to be in accord with its own conclusion. (*O'Neil, supra,* 53 Cal.4th at pp. 351–353; see *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357 [212 Cal.Rptr. 395]; *Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372 [203 Cal.Rptr. 706]; *Garman v. Magic Chef, Inc.* (1981) 117 Cal.App.3d 634 [173 Cal.Rptr. 20] (*Garman*); see also, e.g., *Rastelli v. Goodyear Tire & Rubber Co.* (1992) 79 N.Y.2d 289 [582 N.Y.S.2d 373, 591 N.E.2d 222].)

---

[9] In a footnote, the court stated, "[a] stronger argument for liability might be made in the case of a product that *required* the use of a defective part in order to operate." (*O'Neil, supra,* 53 Cal.4th at p. 350, fn. 6, original italics.) In such a case, replacement of the defective part with "an identically defective" part arguably would not break the chain of causation. The "policy rationales against imposing liability on a manufacturer for a defective part it did not produce or supply would remain," however, and the court declined to express an opinion on the "appropriate resolution" of such a case. (*Ibid.*)

The Supreme Court focused primarily on the decision in *Taylor* which had "addressed the very question presented" to itself. (*O'Neil, supra,* 53 Cal.4th at p. 353.) The court summarized, with evident agreement, the analysis utilized in the *Taylor* decision, in reaching its conclusion, under almost identical circumstances, that the defendants were not strictly liable for their failure to warn of the danger posed by the asbestos contained in component parts made by others and used in conjunction with their own products. (*O'Neil, supra,* 53 Cal.4th at pp. 354–355.)

The court in *O'Neil* noted, first, that the *Taylor* decision held there was no strict liability for the defendants' failure to warn under the " '[c]hain of distribution' " doctrine enunciated in *Peterson, supra,* 10 Cal.4th 1185, that is, the defendants had not been responsible "for placing . . . into the stream of commerce" the component parts that had caused injury to the deceased plaintiff. (*O'Neil, supra,* 53 Cal.4th at p. 354; see *Taylor, supra,* 171 Cal.App.4th at pp. 576, 579.)

Second, as discussed above, the *Taylor* court held California law did not impose strict liability for failure to warn of " 'defects in products supplied by others and used in conjunction with the manufacturer's product unless the manufacturer's product itself causes or creates the risk of harm.' " (*O'Neil, supra,* 53 Cal.4th at p. 354, quoting *Taylor, supra,* 171 Cal.App.4th at pp. 575, 580–583.) The court in *O'Neil* reiterated with approval the principle formulated in *Taylor* that " '[a] manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, [but] that duty arises *only* when the manufacturer's own product causes or creates the risk of harm.' " (*O'Neil, supra,* 53 Cal.4th at p. 355, original italics, quoting *Taylor, supra,* 171 Cal.App.4th at p. 580.)

Third, the court in *Taylor* held strict liability for failure to warn was additionally precluded under the "component parts" doctrine. The Supreme Court in *O'Neil* expressed this doctrine as one providing "that the manufacturer of a component part is not liable for injuries caused by the finished product into which the component has been incorporated unless the component itself was defective and caused harm." (*O'Neil, supra,* 53 Cal.4th at p. 355, citing *Taylor, supra,* 171 Cal.App.4th at pp. 584–586.) The Court of Appeal in *Taylor* found this doctrine applicable because—as in the case before the court in *O'Neil*—the evidence established neither that the defendants' components caused the injuries in issue, nor that the defendants had participated in the integration of their pumps and valves into the carrier's propulsion system. (*O'Neil, supra,* 53 Cal.4th at p. 355, citing *Taylor, supra,* 171 Cal.App.4th at pp. 584–585.)

However, most pertinent to the issue before us, the Supreme Court in *O'Neil* distinguished and did not disapprove the decision in *Tellez-Cordova*. The court found the holding in *Tellez-Cordova* did "not create a broader duty for manufacturers to warn about hazards arising solely from other products." (*O'Neil, supra,* 53 Cal.4th at p. 360.) The court concluded, rather, the decision in *Tellez-Cordova* rested on two alleged facts not present in *O'Neil*: the defendants' power tools in *Tellez-Cordova* "could *only* be used in a potentially injury-producing manner," and it was the action of the defendants' power tools themselves "that *caused* the release of harmful dust, even though the dust itself emanated from another substance." (*O'Neil, supra,* 53 Cal.4th at p. 361, original italics.)

■ *O'Neil* acknowledged that the duty to warn articulated by the Court of Appeal in *Tellez-Cordova,* was "appropriate" under the unique facts presented to the Court of Appeal in that case, when "the defendant's product was intended to be used with another product *for the very activity that created a hazardous situation.*" (*O'Neil, supra,* 53 Cal.4th at p. 361, original italics.) As the court put it, when "the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings . . . [but when] the hazard arises entirely from another product, and the [manufacturer's] product does not create or contribute to that hazard, liability is not appropriate." (*Id.* at pp. 361–362.)

Concluding its analysis, and rejection, of the plaintiffs' claim in *O'Neil* that the defendants were strictly liable for their failure to warn about the dangers of asbestos present in the replacement component parts manufactured by others, the Supreme Court "reaffirm[ed] that a product manufacturer generally may not be held strictly liable for harm caused by another manufacturer's product," *except* "when the defendant bears some direct responsibility for the harm," as when, in *Tellez-Cordova,* "the defendant's own product contributed substantially to the harm," or when "defendant participated substantially in creating a harmful combined use of the products." (*O'Neil, supra,* 53 Cal.4th at p. 362.)

From this careful analysis, the Supreme Court in *O'Neil* formulated this principle: "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product *unless the defendant's own product contributed substantially to the harm, or the*

*defendant participated substantially in creating a harmful combined use of the products.*" (*O'Neil, supra,* 53 Cal.4th at p. 342, italics added.)

## IV. Analysis and Conclusion

We are mindful the plaintiffs in these consolidated appeals are but a few of many injured by their exposure to asbestos-containing products, who are seeking redress for their injuries from increasingly peripheral defendants, as the more principal manufacturers and suppliers of asbestos-containing products seek the protection of bankruptcy. (See *O'Neil, supra,* 53 Cal.4th at p. 354, fn. 9.) We also recognize the public policies that weigh against any expansion of liability for such injuries, under the principles that govern both strict liability and liability for negligence. (*Id.* at pp. 362–363, 364–366.) Nevertheless, we have examined independently plaintiffs' causes of action for strict liability and negligence, summarized above, assuming the truth of their factual allegations. (*Bezirdjian, supra,* 183 Cal.App.4th at p. 321.)

We conclude from *O'Neil*'s explication that plaintiffs' causes of action are sufficient to withstand a motion for judgment on the pleadings. Plaintiffs alleged, essentially, Hennessy designed, manufactured and sold a machine whose *only* purpose and " 'inevitable use' " was to grind brakeshoe linings in order to fit them properly on brakedrums. At all "relevant" times, the brakeshoe linings that Hennessy's machine was designed to grind "contained asbestos." The asbestos in these brake linings was "physically bound," but became airborne and harmful when the linings were subjected to the grinding action of Hennessy's machine. Hennessy knew or should have known that the intended use of its machine would result in the harmful release of airborne asbestos fibers, yet it failed to take reasonable measures to protect those using the machine or in proximity during its use. The machine was defective because it did not include reasonable, protective design features such as a dust collection system or a grinding mechanism exerting sufficient revolution velocity, temperature and pressure, so as to convert any asbestos fibers into nonharmful forsterite. Hennessy's defective grinding machine was marketed to users, and its sole use for grinding asbestos-containing brake linings caused the release of airborne asbestos fibers otherwise contained harmlessly within the linings, resulting in inhalation of asbestos fibers by plaintiffs (or plaintiffs' decedent) and consequent injury to these persons. Hennessy's product was intended to be used with another product for the very activity that created a hazardous situation for the user. Its sole intended use was for an activity known to Hennessy to pose an unreasonable risk of harm.

These allegations distinguish Hennessy from the defendants in *Taylor* and *O'Neil* because the products manufactured by the defendants in those cases were not shown to have caused, created or contributed substantially to the harm of airborne asbestos fibers to which the injured persons in those cases were exposed. (See *O'Neil, supra,* 53 Cal.4th at p. 342; *Taylor, supra,* 171 Cal.App.4th at p. 580.) The causes of action against Hennessy, accepted as true, allege that it manufactured and distributed a machine that did indeed create or contribute substantially to the exposure to airborne asbestos fibers suffered by plaintiffs or plaintiffs' decedent. Nor is liability under these causes of action precluded under either the "chain of distribution" or the "component parts" doctrines applied in *O'Neil* and *Taylor.* Taken as true, the causes of action contend that Hennessy distributed a machine directly to consumers designed only to grind asbestos-containing brake linings, a machine that was defective because its intended operation necessarily released asbestos fibers into the air and was not a machine manufactured for use as a component in another finished product. Unlike defendant's cigarette lighter analogy,[10] the alleged sole and intended use of the brake arcing machine resulted in the release of contained asbestos particles. These allegations satisfy the circumscribed parameters of liability articulated by the Court of Appeal in *Tellez-Cordova* and approved by the Supreme Court in *O'Neil.*

In addition, the imposition of strict liability would not require Hennessy to anticipate or incorporate safety measures into its machine that might be unnecessary for its intended uses, since the machine had only one intended function. (*Taylor, supra,* 171 Cal.App.4th at pp. 582–583.)

As summarized by the Supreme Court, "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product *unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products.*" (*O'Neil, supra,* 53 Cal.4th at p. 342, italics added.) We conclude, at this pleading stage, plaintiffs' allegations in their "Brake Shoe Grinding Machine" causes of action fall within the exception in *O'Neil* sufficiently to withstand a motion for judgment on the pleadings and allow these cases to go forward on strict liability and liability for negligence.[11]

---

[10] See *Garman, supra,* 117 Cal.App.3d at page 639.

[11] We note the allegations do not focus in detail on the duty to warn, but that theory is necessarily implicated in the proposed amended actions.

## DISPOSITION

Each of the judgments in these consolidated cases is reversed and remanded for further proceedings consistent with this opinion.

Dondero, J., and Banke, J., concurred.

On May 3, 2012, the opinion was modified to read as printed above.