[No. B172127. Second Dist., Div. Five. Dec. 1, 2004.]

GIL TELLEZ-CORDOVA et al., Plaintiffs and Appellants, v.
CAMPBELL-HAUSFELD/SCOTT FETZGER COMPANY et al.,
Defendants and Respondents.

COUNSEL

Metzger Law Group, Raphael Metzger and Gregory Coolidge for Plaintiffs and Appellants.

Leck & Associates, Robert B. Leck III; Sedgwick, Detert, Moran & Arnold, Randall A. Miller, Hall R. Marston, Tamra L. Bowman; Bowman and Brooke, Jeffrey A. Swedo, Scott J. Stockdale and Sonja Starins for Defendants and Respondents.

OPINION

ARMSTRONG, J.—This interesting product liability case was decided on demurrer. Plaintiff and appellants are Gill and Francisca Tellez-Cordova, and respondents are Campbell-Hausfeld/Scott Fetzger Company, Fisher Tool Company,[1] and Makita USA. The trial court found that the first amended complaint failed to state a cause of action. We reverse.

Facts[2]

Gill Tellez-Cordova worked as a lamp maker. He cut, sanded, and ground metal parts, working "with and around" mini die grinders, angle head die grinders, straight shaft die grinders, disc grinders, random orbital sanders, and cut-off saws manufactured by respondents. (The complaint identifies each tool by manufacturer, and, for most of the tools, by model number.) He developed interstitial pulmonary fibrosis as a result of exposure to airborne toxic substances produced and released from the metal parts and from the discs, belts, and wheels used on the grinders, sanders, and saws.

As to respondents,[3] the causes of action are negligence, strict liability based on failure to warn, strict liability based on design defect (that the tools lacked exhaust ventilation systems), fraudulent concealment, breach of implied warranty, and (with Mrs. Tellez-Cordova as plaintiff) loss of consortium.

[1] Fisher has filed an appendix to its brief, consisting of a copy of the transcript of the hearing on demurrer. We deem the filing a motion to augment the record with that document, and grant the motion.

[2] Pursuant to usual rules on appeal of a successful demurrer, we accept the well-pleaded factual allegations of the complaint as true. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

[3] Appellants also sued the manufacturers of the abrasive products and manufacturers of other things Mr. Tellez-Cordova worked with, like iron and steel, paint and body filler products, and soldering and welding products.

Factually, the complaint alleged that the tools were specifically designed to be used with abrasive wheels or discs, "for the intended purpose of grinding and sanding metals," that the tools "necessarily operated" with wheels or discs composed of aluminum oxide and other inorganic material, that when the tools were used for their intended purpose, respirable metallic dust from the metal being ground and from the abrasive wheels and discs was generated and released into the air, causing the injury, and that the "specifically designed, intended, and reasonably foreseeable use" of the tools resulted in the injury.

Appellants describe the complaint as alleging that the discs and wheels do not create respirable metallic dust unless they are used with respondents' power tools, because it is the speed and force of those tools which cause the dust to become airborne. This is perhaps not crisply alleged, but the complaint must be liberally construed (*King v. Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857]), and the allegation is certainly inferable from the complaint's references to the "force and abrasive action" of the tools, alleged to create respirable dust.

The complaint alleges that respondents were aware of the danger, and that Mr. Tellez-Cordova was not.

On the design defect cause of action, the allegations are that the tools lacked "local exhaust ventilation devices necessary to prevent or minimize the release of metallic or inorganic dusts during the intended use of . . ." the tools. The allegations on the failure to warn cause of action are the usual ones, that the tools lacked warnings that their intended use would result in the release of dust capable of causing disease, and lacked instructions concerning such safety precautions as use of a respirator. The fraudulent concealment cause of action alleges failure to disclose and concealment of hazards. The allegations of the breach of implied warranty cause of action are similar.

Legally, appellants relied on standard products liability law. They contended that respondents had a duty to warn of the known or knowable health hazards resulting from the intended use of their products. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987 [281 Cal.Rptr. 528, 810 P.2d 549]; *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218 [63 Cal.Rptr.2d 422] ["faultlessly made" product is defective if unreasonably dangerous to place in the hands of a user without a suitable warning and there is no warning].) On the design defect cause of action, they contended that they stated a cause of action under both the consumer expectations test and the risk benefit test. (*Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1181, 1185 [74 Cal.Rptr.2d 580].)

The gist of respondents' demurrer was that they were not liable because the harm (if any) was caused by the wheels, discs, and belts, and not by their tools. That is, they contended that the complaint failed to state a cause of action because there was no allegation that the tools disintegrated or devolved into toxic dust—only the abrasives and the materials being ground did that. Respondents made this argument under several legal theories, including causation under *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398], the component parts doctrine, and uncertainty. Citing *Jimenez v. Superior Court* (2002) 29 Cal.4th 473 [127 Cal.Rptr.2d 614, 58 P.3d 450], *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357 [212 Cal.Rptr. 395], and other cases, they also argue that California has a bright-line rule that a manufacturer's duty to warn is restricted to its own products.

We are not persuaded that any of those theories support judgment on a demurrer here, under the facts alleged.

## Discussion

### *The component parts doctrine*

■ We begin with the component parts doctrine, the legal theory that is perhaps the best fit for respondents' contention. That doctrine "rests on 'a line of cases holding an entity supplying a nondefective raw material or a component part is not strictly liable for defects in the final product over which it had no control.' (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 772 [59 Cal.Rptr.2d 322] citing *Lee v. Electric Motor Division* (1985) 169 Cal.App.3d 375, 385–387 [215 Cal.Rptr. 195]; *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248]; and *Walker v. Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669, 674 [96 Cal.Rptr. 803].) Under the rule of these cases, the manufacturer of a product component or ingredient is not liable for injuries caused by the finished product unless it appears that the component itself was 'defective' when it left the manufacturer. (*Lee v. Electric Motor Division, supra*, 169 Cal.App.3d at p. 384.)" (*Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1550 [71 Cal.Rptr.2d 190]; see Rest.3d Torts, Products Liability, § 5.)

The policy reasons behind the component parts doctrine are well established: " '[M]ulti-use component and raw material suppliers should not have to assure the safety of their materials as used in other companies' finished products. First . . . that would require suppliers "to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use." ' [Citation.] A second, related rationale is that 'finished

product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications.' [Citations.]" *Springmeyer v. Ford Motor Co., supra,* 60 Cal.App.4th 1541, 1554.)

■ The Restatement explains that "A seller ordinarily is not liable for failing to incorporate a safety feature that is peculiar to the specific adaptation for which another utilizes the incomplete product. A safety feature important for one adaptation may be wholly unnecessary or inappropriate for a different adaptation. The same considerations also militate against imposing a duty on the seller of the incomplete product to warn purchasers of the incomplete product, or end-users of the integrated product, of dangers arising from special adaptations of the incomplete product by others." (Rest.3d Torts, Products Liability, § 5, com. d, p. 135.)

■ The doctrine applies to " 'generic' or 'off-the-shelf' components, as opposed to those which are ' "really a separate product with a specific purpose and use." ' [Citation.]" (*Springmeyer v. Ford Motor Co., supra,* 60 Cal.App.4th at p. 1554.)

Respondents claim to be suppliers of generic multi-use parts, asserting in their briefs that their tools have many uses, could come into contact with "a universe of grindable products," could be assembled using a variety of attachments from different manufacturers, and could be used to "manipulate all types of materials, including wood, plastic, glass, and most types of metals."

As appellants argue, these facts contradict the allegations of the complaint, and have no relevance on demurrer. The facts before us are not that respondents manufactured component parts to be used in a variety of finished products, outside their control, but instead that respondents manufactured tools which were specifically designed to be used with the abrasive wheels or discs they were used with, for the intended purpose of grinding and sanding metals, that the tools necessarily operated with those wheels or discs, that the wheels and discs were harmless without the power supplied by the tools, and that when the tools were used for the purpose intended by respondents, harmful respirable metallic dust was released into the air.

The policy reasons identified in the case law and Restatement have no application to these allegations. In order to provide warnings, respondents would not have to employ a huge variety of experts, but would only be required to know what happened when their tools were used for their sole intended purpose. Respondents would not be required to incorporate safety

feature unnecessary for most uses, because under the allegations of the complaint, there is only one use. Nor, under these allegations, is there a "finished product manufacturer" in a better position to understand any special adaptation in the completed product and warn of its dangers. Instead, there is a consumer, using the product exactly as respondents intended.

■ Under this complaint, respondents are not asked to warn of defects in a final product over which they had no control, but of defects which occur when their products are used as intended—indeed, under the allegations of the complaint, as they must be used.

Respondents analogize this case to other California component parts cases, *Lee v. Electric Motor Division, supra,* 169 Cal.App.3d 375, 385–387 and *Zambrana v. Standard Oil Co.* (1972) 26 Cal.App.3d 209 [102 Cal.Rptr. 699]. In *Lee,* the defendant manufactured motors. Another manufacturer bought the motors and incorporated them into a new product, a meat grinder. The allegation was that plaintiff's meat-grinder injury would have been minimized if the motor was designed to stop immediately when turned off. The defendant produced evidence that the motors were ordinary, off-the-shelf, standard items. The court found that the defendant was "a component part manufacturer who had no role in designing the finished product and who supplied a nondefective component part," and thus could not be held liable for the defective design of the finished product. (*Lee,* at p. 385; see also *Fierro v. International Harvester Co.* (1982) 127 Cal.App.3d 862 [179 Cal.Rptr. 923] [manufacturer of a fuel tank installed into a truck manufactured by another entitled to rely on truck manufacturer to ensure proper design and installation]; *Childress v. Gresen Mfg. Co.* (6th Cir. 1989) 888 F.2d 45 [plaintiff injured while using a log splitter, no liability for valve manufactured per the log-splitter-manufacturer's specifications, when the valve functioned as designed]; *In re TMJ Implants Products Liability Litigation* (8th Cir. 1996) 97 F.3d 1050 [no liability where defendant's product was "a mere building-block material suitable for many safe uses," and the finished product was unreasonably dangerous because the component part was unsuited for the use the finished product manufacturer chose].)

In *Zambrana v. Standard Oil Co., supra,* 26 Cal.App.3d 209, Firestone installed a brass stem on an existing valve stem extension on a customer's tire. The allegation was that the combined part was vulnerable to stress, causing the accident. The court noted that the choice of stems was the customer's and that the hazard was obvious, and held that Firestone was not the designer or the manufacturer of the combination of parts and was not strictly liable. (*Id.* at p. 218; see also *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629–630 [157 Cal.Rptr. 248]) [tire manufacturer

Firestone could reasonably believe that the valve stem manufacturer and installer would take appropriate measures to ensure proper design and installation of the valve stem].)

The allegations here distinguish this case from *Lee* and *Zambrana*. In *Lee*, the motor could have been used for multiple purposes. In *Zambrana*, the stem extension could have been used with other kinds of stems and the hazard was obvious. Here, of course, the allegations are that the hazard was not obvious and that respondents' products were designed to be used in but one ultimate "finished product," that is, in combination with the specified abrasive wheels and discs.

Respondents argue that if they are liable here, "whole new classes of defendants, whose safe products happen to be used in conjunction with a defective product made or sold by others would find themselves being sued for matters beyond their control" and that it was impossible for them to foresee what attachment would be used and to what surface it would be applied. These arguments ignore the allegation that it was not happenstance that the tools were used in conjunction with other products, but that use with the specified wheels, discs, and grinders was the inevitable use.

We are influenced in our analysis here by *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825 [20 Cal.Rptr.2d 296], even though it is not, strictly speaking, a component parts case. In *Huynh*, the plaintiff was injured while using a hand-held power grinder with attached disc. When he used the grinder, the disc "exploded." He sued the manufacturer of the grinder for design defects and failure to warn. The manufacturer moved for summary judgment on the affirmative defense of misuse, that the disc exploded because it was not rated for as many rpm's as the grinder. The court held that even if the accident was caused by misuse the manufacturer was liable for foreseeable misuse of its tool unless it provided an adequate warning. (*Id.* at p. 833; see also *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218 [63 Cal.Rptr.2d 422].)

*Huynh* did not consider a component parts defense, but, as appellants argue, it does suggest that the doctrine does not apply here. Under *Huynh*, respondents could be liable for failure to warn of foreseeable misuse. How, then, can they be exempt from liability for the consequences of the intended use?

> *Powell v. Standard Brands Paint Co. (1985) 166 Cal. App. 3d 357 [212 Cal. Rptr. 395]; Garman v. Magic Chef, Inc. (1981) 117 Cal.App.3d 634 [173 Cal.Rptr. 20]*

In *Standard Brands*, the plaintiff used a Standard Brands lacquer thinner to remove sealer from a tile floor. The next day, he finished the project with

another brand, then used an electric buffer. There was an explosion. The court held that the explosion of the other product was not a reasonably foreseeable consequence of Standard Brands' failure to warn, and that "the manufacturer's duty is restricted to warnings based on the characteristics of the manufacturer's own products" (*Powell v. Standard Brands Paint Co., supra,* 166 Cal.App.3d at p. 364, italics omitted), although the court did entertain the possibility of liability if the product with the inadequate warning was identical to the product which caused injury.

In *Garman v. Magic Chef, Inc., supra,* 117 Cal.App.3d 634, the plaintiff had a motor home, which had a propane gas system. The motor home also had a stove, manufactured by defendant. The propane system leaked, and when the plaintiff lit the stove, there was an explosion. Plaintiff contended that the stove's instruction manual was inadequate because it did not warn the user to check the motor home for gas leaks before lighting the stove. We said that the failure to warn was not a legal cause of the explosion—it was the propane tubing, not the stove, which was defective. We pointed out that a lit cigarette could equally have caused the explosion, and said that "[t]he product here did not cause or create the risk of harm" (*id.* at p. 638), that the risk was commonly known, and that stove manufacturer "was under no duty to warn of the possible defect in the product of another." (*Id.* at p. 639.)

Citing these cases, respondents contend that the law in California is that a manufacturer need not warn of defects in the products of another. The argument again misses the point of appellants' complaint, which is that respondents' tools created the dust, even if the dust did not come directly from the tools. In contrast, the Standard Brands thinner worked without a second brand of thinner. Although *Garman v. Magic Chef, Inc., supra,* 117 Cal.App.3d 634, is closer, in that the stove would not work without propane, the stove certainly would have worked if the propane system was intact, and did not leak. Here, the allegation is that the tools had no function without the abrasives which disintegrated into toxic dust. In *Garman,* the propane could have exploded through other instrumentalities, such as a match. Here, the allegation is that the abrasive products were not dangerous without the power of the tools.

■ *Standard Brands* also held that "[A] manufacturer owes a foreseeable user of its product a duty to warn of risks of using the product." (*Powell v. Standard Brands, supra,* 166 Cal.App.3d at p. 362.) That is what appellants have alleged here.

*Bockrath v. Aldrich Chemical Co. (1999) 21 Cal.4th 71 [86 Cal. Rptr. 2d 846, 980 P.2d 398]*

Respondents demurred in part on the basis that appellants did not meet the requirements set forth in *Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th 71, which set out the rules for pleading causation in "a complaint alleging harmful long-term exposure to multiple toxins." (*Id.* at p. 77.)

The plaintiff in *Bockrath* contracted multiple myeloma while working at Hughes Aircraft Company, and sued approximately 55 defendants, including the manufacturers of common items such as WD-40 and rubber cement, contending that his disease arose through exposure to harmful substances in defendants' products.

Our Supreme Court explained, "The law cannot tolerate lawsuits by prospecting plaintiffs who sue multiple defendants on speculation that their products may have caused harm over time through exposure to toxins in them, and who thereafter try to learn through discovery whether their speculation was well-founded." (*Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th at p. 81.) The court held that a plaintiff alleging injury through long-term exposure to multiple toxins must allege exposure to each of the toxins claimed to have caused a specific illness, identify each product that allegedly caused the illness, allege that toxins entered his body as a result of the exposure, allege that each toxin was a substantial factor in bringing about, prolonging, or aggravating the specific illness, and, in the requirement most cited by respondents, allege that "each toxin he absorbed was manufactured or supplied by a named defendant." (*Id.* at p. 80.)

Respondents argue that the pleading requirements were not met here because they did not "manufacture or supply" the toxins. Instead, the toxins came from the wheels, discs, or belts.

We do not see that *Bockrath* applies to the case against respondents. It held only that a plaintiff who sues "multiple defendants on speculation that their products may have caused harm over time through exposure to toxins in them," must match each toxin to a defendant. *Bockrath* did not limit toxic injury cases to the suppliers of toxic substances, but instead set forth the pleading requirements when such suppliers are sued. Appellants have sued under a different kind of theory, that respondents' tools, when used as intended, caused toxic particles to be released from the otherwise harmless wheels and discs. The problem *Bockrath* addressed, pleadings which merely speculated about the source of the injury, has nothing to do with the point respondents raise, that their products did not disintegrate into breathable dust—the wheels and discs did that.

 Along these lines, Makita argues that it has no liability because there is no logical connection between the injury and its conduct, citing the general rule that a defendant cannot be held liable in tort for an injury he or she did not cause. (*Brookhouser v. State of California* (1992) 10 Cal.App.4th 1665, 1677 [13 Cal.Rptr.2d 658].) The argument is unconvincing. Appellants' theory is that Makita's products, when used as intended—indeed, when used in the only way they could be used—did cause the injury, and they pled facts in support of that theory. We cannot say on demurrer that Makita's products did not, as a matter of law, cause the injury alleged.

> *Jimenez v. Superior Court (2002) 29 Cal.4th 473 [127 Cal.Rptr.2d 614, 58 P.3d 450]*

Finally, respondents cite another component parts case, *Jimenez v. Superior Court, supra,* 29 Cal.4th 473 (*Jimenez*). In that case, the court rejected the manufacturer's component parts defense, finding that "The policies underlying strict products liability in tort . . . are equally applicable to component manufacturers and suppliers. . . . For purposes of strict products liability, there are 'no meaningful distinctions' between, on the one hand, component manufacturers and suppliers and, on the other hand, manufacturers and distributors of complete products; for both groups, the 'overriding policy considerations are the same.' [Citation.]" (*Id.* at pp. 479–480.) The case held that "manufacturers of component parts . . . that are installed in mass-produced homes can be subject to strict product liability in tort when their defective products cause harm."[4] (*Id.* at p. 481.)

Respondents focus on one sentence, in a paragraph in which the court disagreed with the manufacturer's contention that its liability ended when the product left its control. The court wrote, "Rarely, if ever, are defective products still in the control of a manufacturer, distributor, or retailer at the time of injury to the consumer. What matters is whether the windows were defective when they left the factory, and whether these alleged defects caused the injuries." (*Jimenez, supra,* 29 Cal.4th at p. 480.) Respondents seem to argue that with the quoted sentence, the court held that a manufacturer can under no circumstances be liable if the product is not defective when it leaves the factory. Thus, respondents argue, they cannot be liable in this case, where the allegations are that the products are defective when used in combination with their necessary attachments.

We do not see that the court made any such holding, or in fact considered, let alone ruled on, the kind of allegations made in this case.

---

[4] There was an additional holding, on the economic loss rule.

## Disposition

The judgment is reversed. Appellants to recover costs on appeal.

Turner, P. J., and Grignon, J., concurred.