Filed 4/21/14  Olivares v. Morehouse-Cowles CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARIA OLIVARES, et al., | B245407 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC447714) |
| v. | |
| MOREHOUSE-COWLES, et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Reversed and remanded.

Rose, Klein & Marias, Gregory Stamos, David A. Rosen, Brian J. Ramsey and Erin M. Beranek, for Plaintiffs and Appellants.

Price, Postel & Parma and Timothy E. Metzinger, for Defendant and Respondent Morehouse-Cowles.

Foley & Mansfield, Douglas G. Wah, Deborah M.D. Gustafson and Holly E. Acevedo, for Defendant and Respondent Littleford Day.

Schaffer, Lax, McNaughton & Chen, Kevin J. McNaughton and Katrina J. Valencia, for Defendant and Respondent Myers Engineering.

_____

Plaintiffs filed a product liability action against five defendants that manufactured commercial machines allegedly designed to mix chemicals used to produce electrical insulation. Plaintiffs' complaint asserted that, during the mixing process, the machines caused the chemicals to emit harmful airborne toxic particles. Several defendants moved for judgment on the pleadings, arguing they could not be held liable for injuries caused by defective chemical products that were used in conjunction with their mixing machines. The trial court granted the motion without leave to amend. We reverse, concluding plaintiffs' complaint adequately states claims for strict liability and negligence.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of Plaintiffs' Complaint*

Plaintiffs Maria Olivares, Diane Cano-Casas and Gerardo Olivares, acting on behalf of themselves and decedent Ramiro Galvan Olivares (Olivares), filed a product liability action against numerous defendants that produced "chemical products" and "mixing . . . machinery" used in the "manufacture of electrical insulating materials, coatings and adhesives"[1] The operative Third Amended Complaint alleged Olivares had been employed as a "mixer" at an electronics company. As part of his job duties, Olivares was required to operate commercial machines that were designed to mix "chemical ingredients" used in the manufacture of electrical insulation. The complaint alleged these mixers caused the chemical ingredients placed within them to emit airborne toxic particles that were absorbed into Olivares's lungs, resulting in lung cancer.

The complaint named 15 "'chemical product defendants'" that had allegedly designed and distributed numerous "ingredients" used to manufacture electrical insulation. The complaint identified the specific chemical ingredients attributable to each

---

[1] For the purposes of brevity and clarity, we hereinafter refer to "electrical insulating materials, coatings and adhesives" as "electrical insulation."

2

of these 15 defendants and the harmful toxins that had allegedly been released from each ingredient.[2]

The complaint also named five "mixing . . . machinery defendants" that had allegedly designed and sold machines for use "in the manufacture of [electrical insulation]."  As with the chemical products defendants, the complaint identified the make or model number of the specific mixing machine each of the five defendants had allegedly designed and sold.  According to the complaint, each of these  machines was comprised of "metal mixing blades" and "a large metallic bowl . . . [that] ha[d] the capacity to heat the material being mixed."

The complaint also included allegations describing how the mixing machines had contributed to Olivares's injuries:  "Each of these mixing machines was specifically designed . . . to mix ingredients for the manufacture of [electrical insulation]. . . . The ingredients for the manufacture of [electrical insulation], in and of themselves, were harmless or at least not inherently dangerous. . . . It was the operation of [defendants'] mixing machines that caused the materials to emit toxic dust, particles and/or fumes. Because of the defect in the mixing machine when used for its sole purpose, the mixing machine caused harmful particles, dust and fumes to be produced, which were created by mixing ingredients for the manufacturer [*sic*] of [electrical insulation.]"  The complaint further alleged Olivares had "used each of the machines for its sole purpose of mixing ingredients for the manufacturer [*sic*] of [electrical insulation]" and was unaware the machines had exposed him to "harmful" airborne toxins.

The complaint asserted claims for strict liability, negligence and breach of warranty.  The negligence claim alleged the mixing machine defendants had been

---

[2]    For example, the complaint asserted defendant Union Carbide Corporation sold "the following products used in the manufacture of [electrical insulation]:  Cyracure, Bakelite ERL 4221, Bakelite ERL 2774, and ERL 4206, which were used by decedent in the course of his employment. . . . [and] contained the following toxins . . . [that] were a substantial factor in causing [Olivares's] lung cancer:  Cyracure contained 7-Oxabicyclo [4.1.0]heptane-3-carboxylic acid . . . Bakelite ERL 4221 contained 3, 4 Epoxycyclohexylmethyl . . . . [etc.]"

"negligent in designing and manufacturing their respective products"; "in failing to adequately warn of the dangers of the exposure to their products"; and "in failing to adequately test their products . . ." The strict liability claim asserted the mixing machine defendants had sold "unreasonably dangerous" and "defectively designed [and] manufactured" products. Finally, the breach of warranty claim alleged the mixing machine defendants had "warranted, either expressly or impliedly, that said products were merchantable when in truth and in fact they were not, each . . . defectively releasing harmful and deleterious toxins."

### B. Mixing Machine Defendants' Motions for Judgment on the Pleadings

Three mixing machine defendants–Morehouse-Cowles, Myers Engineering and Littleford Day (collectively defendants)–filed motions for judgment on the pleadings[3] arguing they could not be held liable for injuries caused by other manufacturers' chemical products that had been used in conjunction with their mixing machines. Defendants asserted that, under *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*), a product manufacturer is generally immune from liability for harm caused by another manufacturer's product, even if it was foreseeable the two products might be used together. Although defendants acknowledged *O'Neil* recognized an exception to this rule in cases where the manufacturer's product was intended to be used with another product for an activity that inevitably resulted in a hazardous situation, they argued plaintiffs' allegations did not fall within the exception. Specifically, defendants contended the exception was inapplicable because the complaint failed to allege their machines could only be used to mix toxic electrical insulation ingredients or that defendants had any knowledge their machines were being used in such a manner.

The trial court granted the motions, ruling that plaintiffs' claims were precluded under *O'Neil* because Olivares's "injury was not [alleged to have been] caused by the

---

**3** Morehouse-Cowles and Myers Engineering filed separate motions for judgment on the pleadings. Littleford Day filed a motion to join in Myers Engineering's motion, which the trial court granted.

4

product[s] manufactured by . . . defendant[s] but by the materials that were placed in [defendants' products]." The court also found the exception articulated in *O'Neil* was inapplicable because "[t]he [complaint] d[id] not allege that mixers associated with [the defendants] could only be used in a potentially-injury producing manner." The court granted the defendants' motions without leave to amend and issued judgments dismissing Morehouse-Cowles, Myers Engineering and Littleford Day from the action. Plaintiffs filed a timely appeal of each judgment.[4]

## DISCUSSION

### A. Standard of Review

"Judgment on the pleadings is akin to a demurrer and is properly granted only if the complaint does not state facts sufficient to state a cause of action against that defendant. [Citations.] The grounds for the motion must appear on the face of the complaint, and in any matters subject to judicial notice. [Citation.] The court accepts as true all material factual allegations, giving them a liberal construction, but it does not consider conclusions of fact or law, opinions, speculation, or allegations contrary to law or judicially noticed facts. [Citations.] Appellate courts review the record de novo to determine whether the complaint states a cause of action as a matter of law." (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1254.)[5]

---

[4] Because the trial court's judgments left no issues to be determined between plaintiffs and each of these three defendants, the judgments are appealable even though plaintiffs' action continued against numerous other defendants. (See *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 821, fn. 3; *Hazel v. Hewlett* (1988) 201 Cal.App.3d 1458, 1463, fn. 3.)

[5] When a motion for judgment on the pleadings has been granted without leave to amend, we generally review the decision to deny amendment to determine """"if there is any reasonable possibility that the plaintiff can state a good cause of action."'" [Citations.]" (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 260.) Plaintiff has the burden to show how the complaint can be amended. (*Ibid.*) In this case, however, plaintiffs have argued only that their Third Amended Complaint properly states causes of action against defendants; they have not offered any possible amendment.

## B. *Summary of Relevant Case Law*

The resolution of this appeal requires us to examine a line of cases addressing the circumstances under which a manufacturer may be held liable for harms caused by another manufacturer's product. Plaintiffs contend their complaint states viable causes of action for negligence and strict liability under *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzer Co.* (2004) 129 Cal.App.4th 577 (*Tellez-Cordova*). Defendants, however, contend plaintiffs' claims are precluded by the California Supreme Court's more recent decision in *O'Neil, supra,* 53 Cal.4th 335, which addresses *Tellez-Cordova*.

### 1. *Tellez-Cordova*

In *Tellez-Cordova, supra,* 129 Cal.App.4th 577, plaintiff was a lamp maker who had used power tools to cut and sand metal parts. After developing lung cancer, plaintiff filed a product liability action asserting claims for strict liability and negligence against the manufacturers of the power tools. The complaint alleged defendants' tools had caused toxic metallic dust to be released from abrasive discs used in conjunction with the tools and from the metal parts that plaintiff had cut and sanded. Although plaintiff admitted no hazardous material had been released directly from defendants' tools, he alleged the tools were "specifically designed" to operate "with . . . [abrasive] discs composed of aluminum oxide and other inorganic material[] that . . . [caused] respirable metallic dust from the metal being ground and from the abrasive wheels and discs [to be] . . . generated and released into the air, . . . result[ing] in the injury." (*Id.* at p. 580.) Plaintiff further alleged the abrasive discs and metal parts were harmless, except when used with defendants' "power tools." (*Ibid.*) Defendants filed a demurrer arguing "they were not liable because the [alleged] harm . . . was caused by the wheels, disc, or belt attachments, and not by their power tools." (*Id.* at p. 581.) The trial court agreed and entered judgment in defendants' favor.

---

Accordingly, the only issue in this appeal is whether the current version of the operative complaint adequately states a claim against the defendants.

The Court of Appeal reversed, concluding that none of the legal theories set forth in defendants' demurrer prohibited plaintiff from pursuing the type of negligence and strict liability claims alleged in his complaint. First, the court rejected defendants' reliance on the "component parts doctrine," which generally precludes liability against "an entity supplying a nondefective raw material or a component . . . for defects in the final product over which it had no control." [Citation.]' [Citations.]" (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 581.) The court explained the doctrine was inapplicable because plaintiff had not alleged that "[defendants] manufactured component parts to be used in . . . finished products, outside their control, but instead that [defendants] manufactured tools which were specifically designed to be used with the abrasive wheels or discs they were used with, . . . that the wheels and discs were harmless without the power supplied by the tools, and that when the tools were used for the purpose intended by [defendants], harmful respirable metallic dust was released into the air." (*Id.* at p. 582.)

Second, the court rejected defendants' argument that the complaint failed to satisfy the requirements of *Bockrath v Aldrich Chemical Co.* (1999) 21 Cal.4th 71, "which set[s] out the rules for pleading causation in 'a complaint alleging harmful long-term exposure to multiple toxins.' [Citation.]" (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 586.) Defendants argued that, under *Bockrath*, plaintiff was required to identify the product that caused his illness and allege that "'each toxin he absorbed was manufactured or supplied by [the] . . . defendant.' [Citation.]" (*Id.* at p. 586.) They further argued that plaintiff failed to satisfy these requirements because the complaint did not allege defendants had "'manufacture[d] or suppl[ied] [any] toxins. Instead, the toxins [allegedly] came from the wheels discs or belts." (*Id.* at p. 586.)

The court disagreed, explaining that *Bockrath* had "held only that a plaintiff who sues 'multiple defendants on speculation that their products may have caused harm over time through exposure to toxins in them,' must match each toxin to a defendant." (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 586.) The court further explained "*Bockrath* did not limit toxic injury cases to the suppliers of toxic substances, but instead

7

set forth the pleading requirements when such suppliers are sued. Appellants have sued under a different kind of theory, that respondents' tools, when used as intended, caused toxic particles to be released from the otherwise harmless wheels and discs." (*Ibid.*)

Finally, the court rejected defendants' contention that plaintiff's claims were barred by the "general rule a defendant cannot be held liable in tort for an injury he or she did not cause." (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 587.) The court explained that plaintiff's theory was that defendants' "products, when used as intended – indeed, when used in the only way they could be used – did cause the injury, and they pled facts in support of that theory." (*Ibid.*)

### 2. O'Neil

In *O'Neil, supra,* 53 Cal.4th 335, a former Navy seaman filed an action against two defendants who manufactured valves and pumps that were used in the propulsion systems of aircraft carriers built during World War II. As required by Navy specifications, the defendants had outfitted the valves and pumps with asbestos-containing internal gaskets and external insulation manufactured by third parties. Plaintiff's complaint asserted claims for strict liability and negligence alleging that, while conducting repairs on an aircraft carrier, he had been exposed to airborne asbestos fibers that were emitted from materials placed in or on the defendants' valves and pumps. (*Id.* at p. 345.)

At trial, defendants produced evidence showing that although their valves and pumps had originally included asbestos-containing gaskets and external insulation, these original components had been replaced by similar asbestos-containing parts many years before plaintiff worked on the carrier. Defendants' evidence also showed their valves and pumps did not require the use of asbestos-containing gaskets or insulation to function properly. At the close of the parties' evidence, defendants moved for nonsuit, arguing there was no evidence they had manufactured or sold the asbestos-containing materials that allegedly caused plaintiff's injury.

8

Plaintiff opposed the motion, arguing that defendants could "be held strictly liable and negligent because it was foreseeable workers would be exposed to and harmed by the asbestos in replacement parts and products used in conjunction with their pumps and valves." (*O'Neil, supra,* 53 Cal.4th at p. 342.) Plaintiff further argued that defendants' products were defective because they had been designed to be used with asbestos-containing parts. The trial court granted the motion and entered judgment in favor of defendants. The Court of Appeal reversed, concluding that *Tellez-Cordova* had established manufacturers have a duty to warn of defects caused by any products that would necessarily be used in conjunction with their products.

The Supreme Court reinstated the judgment of the trial court, explaining that the defendants could not be held liable merely because their products "were used in connection with asbestos-containing parts" or for "failing to warn . . . about the potential health consequences of breathing asbestos dust released from the products used in connection with their pumps and valves." (*O'Neil, supra,* 53 Cal.4th at p. 348.) The court emphasized that, to establish a product liability claim, a plaintiff must prove he or she "suffered injury caused by a defect in the defendant's own product." (*Ibid.*) According to the Court, it had "never held that strict liability extends to harm from entirely distinct products that the consumer can be expected to use with . . . the defendant's nondefective product" and had "never held that a manufacturer's duty to warn extends to hazards arising exclusively from other manufacturers' products." (*Ibid.*)

The Court also rejected plaintiff's contention that the defendants' products were defective because they had been designed to be used with asbestos-containing components. The Court concluded there was no evidence to support this factual assertion. Instead, the evidence at trial showed that: (1) defendants' products did not require "asbestos-containing gaskets or packing in order to function"; and (2) the asbestos-containing gaskets and insulation had been added to the valves and pumps to comply with the Navy's specifications. (*O'Neil, supra,* 53 Cal.4th at p. 349.) The court noted that although "a stronger argument for liability might be made in the case of a product that *required* the use of a defective part in order to operate," plaintiff's evidence

9

showed only that defendants' products were "compatib[le]" with asbestos-containing components, which was "not enough to render them defective." (*Id*. at p. 350 & fn. 6.)

In its analysis, the Supreme Court also explained the appellate court had erred in concluding *Tellez-Cordova* was applicable to the type of claims alleged in the current dispute. According to the Court, the "facts in *Tellez-Cordova* differed . . . in two significant respects." (*O'Neil, supra*, 53 Cal.4th at p. 361.) First, the "the power tools in *Tellez-Cordova* could only be used in a potentially injury-producing manner. Their sole purpose was to grind metals in a process that inevitably produced harmful dust. In contrast, the normal operation of defendants' pumps and valves did not inevitably cause the release of asbestos dust." (*Ibid*.) Second, "it was the action of the power tools in *Tellez-Cordova* that caused the release of harmful dust, even though the dust itself emanated from another substance. . . . The same is not true here. The asbestos dust that injured [plaintiff] came from thermal insulation and replacement gaskets and packing made by other manufacturers. Nothing about defendants' pumps and valves caused or contributed to the release of this dust." (*Ibid*.)

Although the Court concluded *Tellez-Cordova* was not applicable to plaintiff's claims, it approved the general principles set forth in the decision: "Recognizing a duty to warn was appropriate in *Tellez-Cordova* because there the defendant's product *was intended to be used with another product for the very activity that created a hazardous situation*. Where the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings. Conversely, where the hazard arises entirely from another product, and the defendant's product does not create or contribute to that hazard, liability is not appropriate." (*Id*. at pp. 361-362 [emphasis in original].)

In summarizing its ruling, the Court "reaffirm[ed] that a product manufacturer generally may not be held strictly liable for harm caused by another manufacturer's product." (*O'Neil, supra*, 53 Cal.4th at p. 362.) The Court clarified that although *Tellez-Cordova* demonstrated that an "exception[] to this rule arises when . . . the defendant's own product contributed substantially to the harm," plaintiffs were "seek[ing] to expand

10

[this] exception[] to make manufacturers strictly liable when it is foreseeable that their products will be used in conjunction with defective products or replacement parts made or sold by someone else." (*Ibid*.)  The Court concluded there was no basis for such an expansion, holding that "the foreseeability of harm, standing alone, is not a sufficient basis for imposing strict liability on the manufacturer of a nondefective product, or one whose arguably defective product does not actually cause harm." (*Ibid*.)

The Court applied similar analysis to plaintiff's negligence claim, holding that defendants had no duty of care to protect against injuries caused by another manufacturers' replacement parts that had been used in conjunction with their valves and pumps.

### 3. Subsequent decisions applying O'Neil

In *Shields v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 782 (*Shields*) and *Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103 (*Bettencourt*), Divisions 1 and 5 of the First District applied *O'Neil* in assessing whether plaintiffs had properly pleaded claims for strict liability and negligence against the manufacturer of a machine designed to grind asbestos-containing brake pads.  In both cases (which involved the same defendant), plaintiffs alleged that: (1) the sole and intended purpose of defendant's machine was to grind brake pads; (2) at the time defendant produced its machine, all brake shoes contained asbestos, making it evitable the machine would be used in conjunction with asbestos-containing products; (3) the asbestos fibers were physically bound within the brake pad, but became airborne and harmful when subjected to the grinding action of the defendant's machine; and (4) the plaintiffs' injuries were substantially caused by the airborne asbestos fibers.  (See *Shields, supra*, 205 Cal.App.4th at p. 797; *Bettencourt, supra*, 205 Cal.App.4th at p. 1117.)

Both courts concluded plaintiffs' allegations "satisf[ied] the circumscribed parameters of liability articulated by the Court of Appeal in *Tellez-Cordova* and approved by the Supreme Court in *O'Neil*." (*Shields, supra*, 205 Cal.App.4th at p. 798; see also *Bettencourt, supra*, 205 Cal.App.4th at p. 1117 ["plaintiffs state a cause of action . . . under the rules announced in *O'Neil*"].)  The courts emphasized that plaintiffs had

11

alleged the defendant manufactured "a machine whose *only* purpose" (*Shields, supra*, 205 Cal.App.4th at p. 798 [emphasis in original]) was to grind brake shoes "'in a process that inevitably produced harmful dust.'" (*Bettencourt, supra*, 205 Cal.App.4th at p. 1117.) The courts explained these allegations distinguished the cases from *O'Neil*, where the "defendants . . . were not shown to have caused, created or contributed substantially to the harm of airborne asbestos fibers to which the injured persons in those cases were exposed." (*Shields, supra*, 205 Cal.App.4th at p. 798.)

In *Sanchez v. Hitachi Koki* (2013) 217 Cal.App.4th 948 (*Sanchez*), the court applied *O'Neil* in affirming an order granting summary judgment in favor of a defendant who had manufactured a grinder the plaintiff had used in conjunction with a third party manufacturer's saw blade. Plaintiff filed a product liability action alleging he had sustained injuries as the result of design defects in the defendant's grinder. The parties' evidence showed plaintiff had purchased a "Hitachi grinder" that was accompanied by safety instructions expressly warning the grinder "should never be used" with saw blades. (*Id*. at p. 950.) Despite this warning, plaintiff placed a saw blade manufactured by a third party onto the "spindle of the grinder, and attempted to cut [into a] tire." (*Ibid*.) When the saw blade came into contact with the tire, plaintiff "lost control of the grinder, and the saw blade cut [plaintiff's] left hand." (*Ibid*.)

In its motion for summary judgment, defendant argued that, under *O'Neil*, it could not be held liable for plaintiff's injuries because "the saw blade was not manufactured by Hitachi, . . . the grinder did not require the use of the saw blade, and . . . [plaintiff's] own expert conceded . . . the grinder was not intended to be used with a saw blade." (*Sanchez, supra,* 217 Cal.App.4th at p. 952.) Plaintiff, however, contended *O'Neil* was distinguishable because "the grinder itself was defective" in that: (1) it had been designed without a kickback prevention mechanism, and (2) "it was made so that the most common circular saw blade would fit it." (*Ibid*.) The trial court granted the motion, concluding the claims were precluded under *O'Neil*.

On appeal, plaintiff argued the defendant could be held liable "for the injuries caused by the third-party manufacturer's saw blade" because the grinder's two design

12

defects–lack of a kickback mechanism and compatibility with the saw blade–had "contributed substantially to the accident." (*Sanchez, supra,* 217 Cal.App.4th at p. 957.) The court rejected this argument, explaining that, under *O'Neil,* "a product substantially contributes to the harm suffered by a plaintiff only where the intended use of that product inevitably resulted in the harm." (*Ibid.*) According to the court, the undisputed evidence filed in support of the defendant's motion showed plaintiff was not using the grinder in its intended manner at the time he was injured. The court further concluded plaintiff had introduced no evidence indicating the grinder would "inevitably cause personal injury when used as directed." (*Ibid.*)

### *C. Plaintiffs Have Properly Stated Claims for Strict Liability and Negligence*

Applying the cases summarized above, we conclude plaintiffs' complaint alleges sufficient facts to state causes of action for strict liability and negligence. To summarize, the complaint alleges defendants' machines were "specifically designed" for the "sole purpose" of mixing chemical "ingredients [used] for the manufacture of [electrical insulation]." The complaint further alleges that although these "ingredients . . . , in and of themselves, were harmless," the "operation of defendant[s'] mixing machines" caused the chemical ingredients to emit respirable, toxic particles that substantially contributed to Olivares's lung cancer. These allegations are indistinguishable from those in *Tellez-Cordova*, *Bettencourt* and *Shields*. As in those cases, plaintiffs' theory is that defendants' machines caused toxins to be released from chemical products that were harmless except when used in conjunction with defendants' machines. As in *Tellez-Cordova,* plaintiffs also allege the sole purpose of defendant's machines was to mix chemical ingredients in a process that inevitably produced harmful airborne particles.[6]

---

[6] At oral argument, plaintiffs' counsel admitted that, despite the allegations in the complaint, he did not believe plaintiffs would be able to prove the defendants designed their machines for the sole purpose of mixing chemical ingredients used to manufacture electrical insulation. Counsel clarified that although he believed plaintiffs would be able to show defendants knew Olivares's employer was using the machines for that purpose, he could not state unequivocally that defendants' machines had no other nonhazardous applications. Counsel further asserted that, under *O'Neil* and *Tellez-Cordova*, a

13

This is not a case like *Hitachi* or *O'Neil*, where each plaintiff sought to impose liability on the defendants merely because it was foreseeable their product would be used in conjunction with the product that actually caused the plaintiff's injury. Instead, the complaint alleges defendants' product was specifically "intended to be used with another product" (chemical ingredients used to manufacture electrical insulation) "for the very activity that created a hazardous situation" (mixing the chemical ingredients together, causing the release of toxic particles). (*O'Neil, supra*, 53 Cal.4th at p. 361.)

Defendants, however, argue there are three reasons plaintiffs' claims fail. First, they contend plaintiffs' allegations do not establish their mixing machines can only be used to mix chemical ingredients employed in the manufacture of electrical insulation. Defendants assert their machines are generic mixers that "can be safely used to mix" numerous "possible objects/materials or ingredients." According to defendants, under *O'Neil*, they cannot be held liable merely because Olivares's employer elected to use their mixers for an unsafe purpose.

The problem with this argument is that it conflicts with the allegations set forth in the complaint. Plaintiffs do not, as defendants contend, "merely allege . . . these . . . mixers were capable of mixing [any] materials poured into them during the manufacturing process . . . and nothing more." Rather, the complaint alleges the defendants' machines were "specifically designed" for the "sole purpose of mixing

---

manufacturer may be held liable when it has specific knowledge its product is being used with another product in a manner that inevitably results in a hazardous situation, regardless of whether the product may have other intended applications that do not result in a hazardous situation. While this argument may conflict with language in *O'Neil* (see *O'Neil, supra*, 53 Cal.4th at p. 361 [*Tellez-Cordova* applies where manufacturer's product can "only be used [with another product] in a potentially injury-producing manner"]), we express no opinion whether an amended complaint merely alleging that defendants were aware their machines were being used in a manner that inevitably resulted in a hazardous situation would properly state a strict liability or negligence claim. Although we appreciate counsel's candor regarding the limits of what plaintiffs may be able to prove at trial, for the purposes of "reviewing an order sustaining a demurrer, we [must] accept as true the allegations of fact set forth in plaintiff's complaint[]." (*Parthemore v. Col* (2013) 221 Cal.App.4th 1372, 1377.)

ingredients for the manufacturer [*sic*] of electrical [insulation]." The complaint further alleges that although these "ingredients . . ., in and of themselves, were harmless, . . . the operation of defendant[s'] mixing machines . . . caused the materials to emit toxic dust, particles and/or fumes." Defendants' factual assertion their mixers have additional applications beyond those alleged in the complaint is simply not relevant at this stage in the proceedings. (See *Tellez-Cordova, supra*, 129 Cal.App.4th 582 [defendants' assertion their product had "many uses" other than those alleged in the complaint had "no relevance on demurrer"].)[7]

Defendants next contend that plaintiffs' claims do not fall within the exception described in *O'Neil* because the complaint does not allege "all ingredients used to manufacture [electrical insulation] . . . are necessarily toxic." Defendants argue that because the complaint does not "rule out non-toxic ingredients can be used to manufacture [electrical insulation]," it cannot be said that using their machines for their intended purpose inevitably results in a hazardous situation. Stated more simply, they contend *Tellez-Cordova* is inapplicable because the allegations in the complaint suggest their machines can be used to mix nontoxic electrical insulation ingredients. Defendants assert this fact distinguishes the present case from *Shields*, *Bettencourt* and *Tellez-Cordova*, in which the plaintiffs alleged defendants' products were designed to be used

---

**7** We also reject defendants' suggestion that the exception set forth in *Tellez-Cordova* is inapplicable if a manufacturer's product has any conceivable application that is not "potentially-injury producing." Defendants argue the complaint's description of the mixing machines – "a large metallic bowl [and] metal mixing blades" – demonstrates the machines might be used for something other than mixing the ingredients used to make electrical insulation. Defendants appear to contend that because many "innocuous" items might be placed in a metal bowl and mixed, they cannot be held liable under the *Tellez-Cordova* exception. However, as explained in *O'Neil*, the exception applies where the "the defendant's product was intended to be used with another product for the very activity that created a hazardous situation." (*O'Neil*, *supra*, 53 Cal.4th at p. 361.) According to the allegations in the complaint, that is exactly what occurred here. If plaintiffs are correct that defendants specifically designed their machines for the sole purpose of mixing electrical insulating materials that emit toxic particles during the mixing process, the exception articulated in *O'Neil* would apply even if the machines might be used for some other purpose that was never intended by the defendants.

15

with one particular type of product that necessarily emitted harmful dust when used in conjunction with defendants' products (asbestos-containing brake pads in *Shields* and *Bettencourt*, and metal parts and abrasive discs in *Tellez-Cordova*.)

We disagree with defendants' characterization of plaintiffs' allegations. At the pleadings stage, "the allegations of the complaint must be read in the light most favorable to the plaintiff and liberally construed." (*Westinghouse Electric Corp. v. Newman & Holtzinger* (1994) 39 Cal.App.4th 1194, 1199.) "'A fact may appear by inference as well as by direct allegation.' [Citation.]" (*Rickley v. Goodfriend* (2013) 212 Cal.App.4th 1136, 1141.) Although plaintiffs do not directly allege that all chemical ingredients used to manufacture electrical insulation emit toxic particles when mixed in defendants' machines, that allegation can be fairly inferred from the complaint. As explained above, the complaint states defendants' machines were "specifically designed . . . to mix ingredients for the manufacture of electrical [insulation]. . . . The ingredients for the manufacturer [*sic*] of [electrical insulation], in and of themselves, were harmless or at least not inherently dangerous unless dust, particles, and/or fumes were produced. It was the operation of defendant[s'] mixing machines that caused the materials to emit toxic dust, particles and/or fumes." There is no allegation that some of the ingredients defendants' machines were designed to mix emitted toxic particles, while others did not. Liberally construed in favor of the plaintiffs, the complaint essentially asserts that: (1) the defendants' machines were intended to mix chemical ingredients used to manufacture electrical insulation; and (2) chemical ingredients used to manufacture electrical insulation necessarily emit toxic particles when mixed in defendants' machines.

Finally, defendants argue we should uphold trial court's judgments because "the chemical products at issue in this action are allegedly dangerous in and of themselves. They can release toxic fumes through many uses, not just when they are used with mixers." Defendants appear to assert that, based on the allegations in the complaint, their machines were not a substantial factor in causing Olivares's injuries because he would have been exposed to harmful chemical toxins regardless of whether he had used the

16

defendants' mixing machines.**8** As with defendants' other contentions, this argument fails because it conflicts with the allegations set forth in the complaint. The complaint asserts that the chemical ingredients used to manufacture electrical are "in and of themselves . . . harmless" and emit toxic particles only when subjected to the mixing action of defendants' machines. At this stage in the case, we must accept this allegation as true. (See *Bettencourt, supra*, 205 Cal.App.4th at p. 1124 [defendant's assertion plaintiff would have been exposed to asbestos regardless of whether he used defendant's grinding machine was "inconsistent with [plaintiffs] allegations . . . [that] the brake lining . . . did not pose a danger until asbestos fibers were released by the action of [defendant's] machines"].)**9**

In sum, we conclude that although a manufacturer is generally not liable for harm caused by another manufacturer's product, plaintiffs have pleaded facts that bring their strict liability and negligence claims within the exception to this rule articulated in *Tellez-Cordova* and approved of in *O'Neil*. We therefore reverse the trial court's judgments dismissing Morehouse-Cowles, Littleford Day and Myers Engineering from the action.**10**

---

**8**     The trial court's statements at the motion hearing suggest that it agreed with this argument: "The . . . [chemical] products here would have presented a danger to the plaintiff's health whether they were used in combination with the [defendants'] equipment . . . some other equipment, or even all by themselves. It was the dust that emanated. So the JOP motion is granted."

**9**     Morehouse-Cowles also argues plaintiffs failed to satisfy the pleading requirements set forth in *Bockrath, supra,* 21 Cal.4th 71, because the complaint does not "identify any specific toxins originating from the mixing machines." As explained above, this same argument was considered and rejected in *Tellez-Cordova*, which explained that *Bockrath* has no relevance to the type of claim asserted here. (See *Tellez-Cordova, supra*, Cal.App.4th at p. 586.) Morehouse-Cowles has offered no argument distinguishing *Tellez-Cordova's* application here.

**10**     None of the parties address whether plaintiffs have properly stated a claim for breach of warranty nor do they address whether such a claim would be subject to the same analysis set forth in *Tellez-Cordova* and *O'Neil*. Having concluded the judgments

17

**DISPOSITION**

The trial court's judgments entered in favor of Morehouse-Cowles, Littleford Day and Myers Engineering are reversed. Appellants are to recover their costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.*

---

must be reversed because plaintiffs stated viable claims for strict liability and negligence, we need not address plaintiffs' warranty claim.

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.